## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| PARADISE WIRE & CABLE DEFINED BENEFIT PENSION PLAN, HOLLINGSWORTH, MENDENHALL AND MCFADDEN LLC, IG HOLDINGS, INC., and IG REVOCABLE TRUST, individually on behalf of themselves and all others similarly situated, 7000 N 16th Street Ste. 120 Phoenix, AZ 85020 | Civil Action No. |
| | **CLASS ACTION COMPLAINT** |
| Plaintiffs, | |
| v. | **JURY TRIAL DEMANDED** |
| EDWARD M. WEIL, JR. c/o American Realty Capital -- Retail Centers Of America, Inc. 405 Park Avenue New York, NY, 10022 | |
| LESLIE D. MICHELSON c/o American Realty Capital -- Retail Centers Of America, Inc. 405 Park Avenue New York, NY, 10022 | |
| EDWARD G. RENDELL c/o American Realty Capital -- Retail Centers Of America, Inc. 405 Park Avenue, New York, NY, 10022 | |
| AR GLOBAL INVESTMENTS LLC 405 Park Avenue New York, NY, 10022 Serve on Resident Agent: CORPORATION SERVICE COMPANY 2711 Centerville Rd, Suite 400 Wilmington, DE 19808 | |
| AMERICAN FINANCE TRUST, INC 405 Park Avenue New York, NY, 10022 Serve on Resident Agent: | |

1

CSC-LAWYERS INCORPORATING SERVICE
COMPANY
7 St. Paul Street
Suite 820
Baltimore, MD 21202

-and-

AMERICAN REALTY CAPITAL -- RETAIL
CENTERS OF AMERICA, INC.
405 Park Avenue
New York, NY, 10022
Serve on Resident Agent:
CSC-LAWYERS INCORPORATING SERVICE
COMPANY
7 St. Paul Street
Suite 820
Baltimore, MD 21202

Defendants.

## COMPLAINT

Plaintiffs, Paradise Wire & Cable Defined Benefit Plan and Hollingsworth, Mendenhall and McFadden LLC  ("Plaintiff" or the "Plans"), IG Holdings, Inc., and IG Revocable Trust by their attorneys, allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters derived from, *inter alia*, counsel's review of documents filed with the U.S. Securities and Exchange Commission ("SEC"), press releases issued by American Realty Capital – Retail Centers of America, Inc. ("RCA" or the "Company"), and publicly available news sources:

## SUMMARY OF THE ACTION

1.      This is a class action arising from defendants efforts to effect a merger (the "Proposed Merger") between RCA and defendant American Finance Trust, Inc. ("AFIN"), both of which are under the common control of defendant AR Global Investments LLC ("AR

Global"), for the sole financial benefit of AR Global by way of a materially false and misleading Joint Proxy/Prospectus filed with the Securities and Exchange Commission on December 6, 2016 (the "Proxy") and in breach of their fiduciary duties.. Specifically, the Proposed Merger, if consummated, will enable AR Global to lock in a lucrative management contract and concomitant fees which are likely to soon dissipate based upon its contract with RCA, for an extended period of 20 years.

2.      Defendants' strategy, however, will result in Plaintiffs and other RCA stockholders receiving inadequate compensation for the value of the Company's assets which could be achieved through an alternative transaction including a liquidation of RCA's real estate holdings. Therefore, in seeking to gain stockholder approval which is a necessary prerequisite to effectuate the Proposed Merger, Defendants have: (a) acted in bad faith in violating the express terms of the Company's Articles of Incorporation ("Charter") and in violation of their duties and the appropriate standard of conduct under Maryland Corp. and Ass'n. Code Ann. Section 2-405 ("Section 2-405); (b) breached their fiduciary duties by failing to follow a proper process such that they acted in a fully informed manner, in a manner that an ordinary person in a like position would use under similar circumstances and without disabling conflicts of interest;; and (c) violated Section 14(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78n(a), and SEC Rule 14a-9 promulgated thereunder, 17 C.F.R. §240.14a-9 and their common law duties by disseminating the materially misleading Proxy soliciting RCA stockholders' approval of the Proposed Merger currently scheduled to be held on February 13, 2017.

## PARTIES

3.      Plaintiffs are, and have been at all relevant times, the owners of RCA common stock as set forth in the certifications attached to this Class Action Complaint ("Complaint").

4.     Defendant RCA is a Maryland corporation organized as a real estate investment trust ("REIT") for U.S. federal income tax purposes and maintains its principal place of business at 405 Park Avenue, 14th Floor, New York, NY.  RCA's securities are registered with the SEC pursuant to Section 12 of the Securities Exchange Act of 1934 (the "Exchange Act") but are not listed for trading on any securities exchange.

5.     Defendant AR Global maintains its corporate headquarters at 405 Park Avenue, New York, NY 10022.  AR Global describes itself as an alternative asset manager with an emphasis on real estate investments, having over $18 billion of real estate and loans under management.  AR Global through an indirect wholly owned subsidiary manages the affairs of the Company.  The Company currently pays AR Global an Asset Management Fee (as defined in an advisory agreement or the "Advisory Agreement") equal to 0.0625% per month of the estimated net asset value per share of common stock as compensation for services rendered in connection with the management of its assets.

6.     Defendant AFIN is a Maryland corporation organized as a REIT with a principal place of business at 405 Park Avenue, New York, NY.  It owns a diversified portfolio of commercial properties primarily comprised of freestanding single-tenant properties that are net leased to investment grade and other creditworthy tenants.  All of its properties are managed by American Finance Properties, LLC, an affiliate of AR Global.  Weil is AFIN's chief executive officer and the chairman of its Board, and its lead independent director, David Gong ("Gong") served as a director of RCA.  After consummation of the Proposed Merger, affiliates of AR Global will continue to act as the advisor to AFIN.  AFIN has further agreed to expand its board after consummation of the Proposed Merger so that both Michelson (defined below) and Rendell (defined below) may occupy those newly created positions.

7.      Defendant Weil is the Company's Chief Executive Officer ("CEO"), President and Chairman of the Board, and the CEO and Chairman of the Board of AFIN.  In addition, Weil serves as the CEO of defendant AR Global.

8.      Defendant Michelson has been designated by the Company as the "Lead Independent Director" and also serves as Audit Committee Chair of RCA.  Michelson, however, in truth and fact, is not independent,  Instead, Michelson also serves as a purportedly independent director of the following entities managed or advised by defendant AR Global:  Health Trust, Inc. ("HTI"); Business Development Corporation of America ("BDCA"); Business Development Corporation of America II ("BDCA II"); and Realty Capital Income Funds Trust ("RCIFT"). From his service on the Company's board alone, Michelson earns over $100,000 per year, and his combined compensation from all AR Global entities is believed to exceed $500,000 per year, a primary source of his personal livelihood.  Michelson has received at least $2.2 million for his services as a director of AR Global managed entities over the past four years.  After the Proposed Merger, AFIN intends to expand its Board to provide Michelson with a seat.

9.      Defendant Rendell also has been designated by RCA  as a purportedly independent director of the Company.  Rendell, however, in truth and in fact, is not independent, Instead, Rendell also serves as a purportedly independent director of the following entities managed or advised by AR Global:  Global Net Lease, Inc.; HTI; BDCA; and BDCA II.  From his service on the Company's board alone, Rendell earns over $100,000 per year and his combined compensation from all AR Global entities is believed to exceed $500,000 per year and be a primary source of his personal livelihood. Rendell has received at least $2.2 million for his services as a director of AR Global managed entities over the past four years.  After the Proposed Merger, AFIN will expand its Board to provide Rendell with a seat.

## JURISDICTION AND VENUE

10.    This Court has jurisdiction over Counts I and II of this action under federal question jurisdiction pursuant to 28 U.S.C. §1331 because this action arises under the laws of the United States and  Section 27 of the Exchange Act, 15 U.S.C. §78aa, because this action asserts claims under Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a).  In addition, The Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367 over Counts III and IV of this action which arise under state law.

11.    The Court has personal jurisdiction over each Defendant PURSUANT TO Section 27 of the Exchange Act and because the Company is either a corporation that conducts or has transacted business in and/or maintains operations in this District and the Director Defendants are individuals who are either present in this District for jurisdictional purposes or have sufficient minimum contacts with this District by way of the business they conduct with the Company, as to render the exercise of personal jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

12.    Venue is proper pursuant to 28 U.S.C.  §1391 because the principal places of business of defendants RCA, AR Global and AFIN are in this District and a substantial part of the events, acts and omissions giving rise to Plaintiff's claims occurred in this District.   In addition, the Company has adopted a forum selection clause in its by-laws providing for litigation of these claims in this District.

## SUBSTANTIVE ALLEGATIONS

### The Company and its Relationship to AR Global

13.    RCA was incorporated on July 29, 2010, as a Maryland corporation and qualified as a REIT for U.S. federal income tax purposes beginning with the taxable year ended December

31, 2012.  RCA is a non-traded, externally-advised REIT with a focus on acquiring a diversified portfolio of anchored, stabilized core retail properties, including power centers and lifestyle centers in the United States.

14.    On March 17, 2011, RCA commenced an initial public offering (the "IPO") on a "reasonable best efforts" basis of up to 150.0 million shares of common stock, $0.01 par value per share, at a price of $10.00 per share, subject to certain volume and other discounts.  RCA closed its initial public offering of common stock on September 2013, and through that offering and its dividend reinvestment plan, raised approximately $983.8 million in total gross proceeds through December 15, 2016.   The Company is required to engage in a  transaction creating liquidity for stockholders within six years of the completion of its IPO.

15.    RCA has, since the IPO, purportedly implemented its stated investment strategy of acquiring a diversified portfolio of anchored, stabilized core retail properties, including power centers, lifestyle centers, grocery-anchored shopping centers (with a purchase price in excess of $20 million), and other need-based shopping centers, or collectively, large retail assets, which are located in the United States and at least 80.0% leased at the time of acquisition. RCA has also pursued a publicly stated strategy of financing its portfolio opportunistically at a target leverage level of not more than 50% loan-to-value.  Key to RCA's stated investment strategy has been its stated intention "to maximize stockholder total returns through a highly disciplined acquisition strategy, *with a constant view towards a seamless and profitable exit*."  RCA 2015 Form 10-K at p.2 (emphasis added).

16.    Substantially all of RCA's business is conducted through American Realty Capital Retail Operating Partnership, L.P. (the "OP"), a Delaware limited partnership.  The OP, in turn, employs American Realty Capital Retail Advisor, LLC (the "Advisor"), an entity

affiliated with AR Global which itself is the successor business to AR Capital, LLC, and which manages the day-to-day business of the Company. The Advisor, in turn, maintains a service agreement with a purportedly independent third party, Lincoln Retail REIT Services, LLC, a Delaware limited liability company ("Lincoln"), pursuant to which Lincoln provides, subject to the Advisor's oversight, real estate-related services, including locating investments, negotiating financing, and providing property-level asset management services, property management services, leasing and construction oversight services and disposition services.

**The Company's Charter Contains Provisions**
**Protecting the Rights of Minority Stockholders**

17.    State securities administrators required RCA to include provisions in its Charter designed to prevent abuse by its controlling persons, such as AR Global, and to mitigate the risks to stockholders that are associated with holding shares of a non-publicly traded company, such as Class members here. Those provisions are derived from the North American Securities Administrators Association's Statement of Policy Regarding Real Estate Investment Trusts.

18.    In order to satisfy these requirements, Article VIII of RCA's Charter limits the length of any advisory agreement to one year, caps the Advisor's compensation and requires the Board to review the Advisor's performance and evaluate the Advisor's compensation. Article VIII also provides that the Advisor has a fiduciary duty to RCA and its stockholders.

19.    More specifically, pursuant to Sections 8.1 and 8.2 of the Charter, the Advisor is not to serve a term of more than one year (although there is no limit on the number of times that it may be retained for one year periods), and the Board is required to evaluate the Advisor's performance before entering into or renewing an agreement with the Advisor, ostensibly providing the Company with the opportunity to refuse to retain the Advisor in the event of its

poor performance or other conduct. The Board is further charged with the responsibility to review the Advisor's fees and expenses to ensure that they are reasonable.

20.     The Company's purportedly independent directors, Michelson and Rendell, are further charged with the duty to supervise the performance of the Advisor.

21.     Pursuant to Section 8.3 of the Charter, the Advisor has "a fiduciary responsibility and duty to the Company and to the Stockholders."

22.     In addition, Article XIV of RCA's Charter titled "ROLL-UP Transactions" provides substantive protections for certain related party transactions by providing that:

(i)     In connection with any proposed Roll-Up Transaction, an appraisal of all of the Company's assets shall be obtained from a competent Independent Appraiser. The Company's assets shall be appraised on a consistent basis, and the appraisal shall be based on the evaluation of all relevant information and shall indicate the value of the assets as of a date immediately prior to the announcement of the proposed Roll-Up Transaction . . . A summary of the appraisal, indicating all material assumptions underlying the appraisal, shall be included in a report to Stockholders in connection with a proposed Roll-Up Transaction. In connection with a proposed Roll-Up Transaction, the person sponsoring the Roll-Up Transaction shall offer to holders of Common Shares who vote against the proposed Roll-Up Transaction the choice of:

    (a)     accepting the securities of a Roll-Up Entity offered in the proposed Roll-Up Transaction; or

    (b)     one (1) of the following:

        (I)     remaining as Stockholders of the Company and preserving their interests therein on the same terms and conditions as existed previously; or

        (II)     receiving cash in an amount equal to the Stockholder's pro rata share of the appraised value of the net assets of the Company.

(ii)     The Company is prohibited from participating in any proposed Roll-Up Transaction:

    (a)     that would result in the holders of Common Shares having voting rights in a Roll-Up Entity that are less than the rights provided for in Article XI hereof;

    (b)     that includes provisions that would operate as a material impediment to, or frustration of, the accumulation of shares of stock by any purchaser

of the securities of the Roll-Up Entity (except to the minimum extent necessary to preserve the tax status of the Roll-Up Entity), or which would limit the ability of an investor to exercise the voting rights of its securities of the Roll-Up Entity on the basis of the number of shares held by that investor;

(c)     in which investor's rights to access of records of the Roll-Up Entity will be less than those described in Sections 11.5 and 11.6 hereof; or

(d)     in which any of the costs of the Roll-Up Transaction would be borne by the Company if the Roll-Up Transaction is rejected by the holders of Common Shares.

**AR Global' s Business Model is Threatened by a Major Fraud**

23.     AR Global previously engaged in a lucrative business model, through which it syndicated and managed non-publicly traded REITs, thereby earning substantial streams of revenue from its corporate affiliates both through syndication and management fees.   AR Global's ability to syndicate new REITs was eliminated when in or about October 29, 2014, American Realty Capital Properties, Inc. ("ARCP"), the lead and largest company in the AR Global corporate empire, disclosed a significant accounting fraud which, since that time, has resulted in the indictment of several its key officers.

24.     After disclosure of the ARCP accounting fraud, brokers halted sales of investments tied to AR Global's founder Nicholas Schorsh ("Schorsh") and thus to AR Global. In November 2015, AR Global announced that it had stopped incorporating new non-traded REITs and according to published reports, has proven unsuccessful in obtaining new, substantial sources of investor capital.   Moreover, a number of entities have terminated their advisory agreements with AR Global affiliates.   On December 3, 2015, for instance, Phillips Edison Grocery Center REIT II terminated its advisory agreement with AR Global.   On April 4, 2016, United Development Funding Income V terminated its advisory agreement with AR Global.

25.     AR Global has responded to its inability to raise money through syndication, in part, by seeking to engage in related party transactions that are designed to enable it to continue to earn lucrative management fees to which it might otherwise not be entitled.  On or about May 25, 2016, for instance, New York REIT, Inc. ("NY REIT"), another AR Global controlled REIT, which is publicly traded, rather than liquidating as originally planned, attempted to engineer a merger transaction designed to preserve AR Global's lucrative management fees.  On or about August 9, 2016, NY REIT was forced to withdraw that merger proposal based upon vigorous opposition from institutional stockholders, one of whom launched a proxy contest designed to unseat the board of directors.

**Defendants Plan The Proposed Merger**

26.     By early 2016, Defendants had crafted a two-step plan to eliminate certain shareholder rights guaranteed to them under the Charter in a roll up situation, and then to propose the Proposed Merger, a roll up transaction, directed at extending AR Global's lucrative Advisory Agreement, but which provided Class members with unfair and inadequate consideration, and to solicit its approval without adequate disclosure (or director consideration and review) of critical information regarding the appraised value of RCA's assets (or a relevant evaluation of AFIN"s net asset value or NAV).

27.     On February 16, 2016, the lead independent director of AFIN purportedly sent a letter to the non-management directors of the Board inviting RCA to commence discussions relating to a possible business combination.  On February 26, 2016, UBS Securities LLC ("UBS"), on behalf of AFIN's independent directors, delivered a letter to the non-management directors of RCA providing further details on a proposed transaction.  The parties purportedly

entered into a mutual nondisclosure agreement effective as of March 2, 2016 which enabled AFIN to access nonpublic information about RCA.

28.    On March 14, 2016, RCA's non-management directors, calling themselves a "Special Committee", retained BMO Capital Markets, Inc. ("BMO") to provide financial advice and assistance in connection with AFIN's proposed transaction.  The Committee retained BMO despite the fact that it had an existing financial relationship with AR Global, and therefore was conflicted.  In addition, the Special Committee structured its retention of BMO to incentivize it to opine in favor of the Proposed Merger by agreeing to pay BMO $1.0 million upon the delivery of its opinion and an additional $4.9 million upon the closing of the Proposed Merger. *See* Proxy at 128.

29.    On April 2, 2016, the independent directors of AFIN purportedly made their initial proposal to acquire each share of RCA common stock for 0.365 shares of AFIN common stock ($8.82 based on AFIN's published per share NAV of $24.17 as of December 31, 2015) and $0.98 in cash (the "April 2 Offer Letter").  The offer was subject to a financing contingency.

**AR Global Lays the Groundwork for Improperly Extending RCA's**
**Advisory Agreement and Continuing to Earn Management**
**Fees  From RCA's Assets While Planning the Proposed Merger**

30.    On April 29, 2016, Defendants launched the second step of their plan to eliminate the rights of RCA stockholders in a roll-up transaction by causing RCA to circulate a proxy statement with respect to an annual meeting of stockholders (the "Annual Meeting") to be held on June 29, 2016 (the "April Proxy Statement").

31.    In addition to seeking stockholder approval of the election of directors, the April Proxy Statement proposed a series of "bundled" amendments to the Charter (the "Charter Amendments"), seeking among other things, to  eliminate stockholder rights in anticipation of

the Proposed Merger, including those provision of the Charter that limited the Advisor's right to have its agreement renewed to one year increments, and provided stockholders with critical rights in the event of a roll up transaction, such as the Proposed Merger.

32.     On May 17, 2016, AFIN's special committee purportedly sent another non-binding letter to the Committee proposing the same $9.80 per share consideration it had proposed in its April 2 Offer Letter, consisting of the same combination of AFIN stock (at a 0.365 exchange ratio) and cash ($0.98, the "May 17 Letter").   AFIN sent this letter to communicate that the pricing in its April 2 Offer Letter remained unchanged following its review of financial information posted to RCA's electronic data room.  The May 17 Letter stated that the Proposed Merger would create synergies and cost savings and provided a preliminary estimate of these synergies and cost savings based on the existing advisory and management agreements of each of AFIN and RCA.  The letter also indicated that the Proposed Merger would not be subject to a financing contingency and would include (a) a 45-day go shop period, (b) a "fiduciary out" that would allow RCA to terminate any resulting agreement to accept a superior proposal, and (c) a two-tiered termination fee of 0.5% and 2.5% of the equity value of the transaction with the lower fee applicable to any termination resulting from a superior proposal during the go shop period.  The letter expressed a willingness to explore additions to AFIN's Board.

33.     On May 26, 2016, a stockholder derivative action captioned *Simpson v. Michelson, et al.*, Civ. 16-0397 (the "Simpson Action") was filed in the U.S. District Court for the Southern District of New Yorkt alleging, among other things, that by way of the April Proxy Statement, the Director Defendants were seeking to eliminate stockholder rights by improperly bundling together certain stockholder proposals, particularly those enumerated as Proposals 8

and 11, contained in the Company's Charter in violation of Rules 14a-4(a)(3) and 14a-4(b)(1) of the Exchange Act. Proposals 8 and 11, respectively sought to eliminate provisions contained in Articles VIII and XIV of the Charter providing substantive protections to RCA's stockholders in the event of a roll up transaction, and the limitations on the Board's ability to renew the Advisory Agreement and the providing that the Advisor was a fiduciary to the Company and its stockholders.

34.     On June 8, 2016, the Company issued a press release disclosing that the Board had earlier established a special committee (the "Committee") purportedly comprised entirely of its non-management directors whom the press release characterized as "independent," in response to its receipt of a purportedly unsolicited proposal (the "Proposal") from AFIN. According to the press release, the Committee was established in order to consider, review and evaluate the Proposed Merger and, if deemed appropriate, to negotiate the terms of the Proposed Merger. The press release, however, stated that the Committee had not undertaken, and was not authorized to undertake, a broader review of the Company's strategic alternatives other than in connection with the Proposed Merger or any potential conflicts of interest that might arise out of or result from the Proposed Merger.

35.     On June 14, 2016, the Committee approved a counter-proposal containing the following terms: (i) per share consideration to RCA shareholders of 0.385 shares of AFIN common stock and $0.95 in cash and (ii) amendments to the AFIN Advisory Agreement. The proposed amendments provided for: (a) a 10-year term subject to two successive five-year renewal terms absent a non-renewal election; (b) a performance-based termination right; and (c) a termination right tied to fees under the agreement ceasing to be fair. The Committee

determined that proceeding with the transaction on the terms outlined in the counterproposal would be more beneficial to RCA than the alternatives considered.

36.     On June 17, 2016, representatives of UBS communicated, on behalf of the AFIN Special Committee, a response to the Committee's counterproposal, accepting RCA's requested consideration per share and indicating that the AFIN Advisor had informed the AFIN Special Committee that it was unwilling to amend the AFIN Advisory Agreement.

37.     On June 28, 2016, the Committee sent a letter to the AFIN Special Committee confirming the Committee's earlier proposal of a 0.385 exchange ratio and $0.95 in cash (previously accepted by the AFIN Special Committee) and further proposed: (i) no change to the fees payable under the AFIN Advisory Agreement; (ii) no change to the existing 20-year term; (iii) acceptance of the change of·control termination right and related termination fee proposed by the AFIN Advisor subject to use of the current fee levels in computation of the termination fee; and (iv) a performance-based termination right.  The performance-based termination right would have entitled AFIN to terminate the AFIN Advisory Agreement by a two-thirds vote of its independent directors upon payment of a termination fee equal to 50% of the proposed change of control termination fee.

38.     On June 29, 2016, the Company filed a Form 8-K with the SEC in which it disclosed that the Annual Meeting was being adjourned until July 15, 2016, in order to permit stockholders additional time to consider the proposed charter amendments.

39.     On July 29, 2016, RCA filed a Form 8-K with the SEC announcing that the annual meeting of stockholders was adjourned to August 11, 2016 in order to permit stockholders to consider Proposals No. 3 through 7, Proposal No. 9 and Proposal No. 10.  The

proposed Charter Amendments contained in proposals No. 8 and 11 had been withdrawn in response to and in settlement of the stockholder derivative lawsuit.

40.     On July 6, 2016, Defendant Weil, in his capacity as the CEO of the AFIN Advisor, sent a letter to the Committee proposing inclusion in the AFIN Advisory Agreement of an option on the part of the AFIN Board to elect to internalize the management of AFIN upon specified conditions: (i) a unanimous vote in favor of internalization by the independent directors; (ii) no election to internalize before January 1, 2018; (iii) one-year advance notice of the effective date of the internalization; and (iv) payment of an internalization fee.  The proposed internalization fee would equal 4.5 times the sum of all gross management fees, incentive fees and reimbursables received by the AFIN Advisor on a current run rate, annualized basis under the existing AFIN Advisory Agreement if internalization occurred between January 1, 2018 through December 31, 2028.  A multiple of 3.5 would be used to calculate the internalization fee if internalization occurred thereafter.  If AFIN were contemplating a strategic transaction prior to the effective date of the internalization, then the fee base to which the 4.5 multiple or 3.5 multiple would apply would also include the fees that would have been payable to the AFIN Advisor in the one-year period following the close of such strategic transaction had the internalization not occurred.  In addition, the internalization would also trigger a $15 million payment on account of discontinuance costs for transfer of intellectual property, information technology and related assets and services.  The response letter also proposed an increase in the base management fee effective upon closing of the RCA merger, with the amount of the increase being fixed at $6 million in the first year after the closing; $7 million in the second year; and $8 million in and after the third year.  Finally, the response letter also provided for one of the current directors of RCA to join the AFIN Board at closing of the merger.

41.     Negotiations over matters primarily relating to the status and compensation of AR Global in the combined entity purportedly continued over the next several months.

**Defendants Announce the Proposed Merger**

42.     On September 7, 2016, RCA issued a press release announcing that the Committee had approved a definitive merger agreement (the "Merger Agreement") with AFIN for a transaction valued at approximately $1.4 billion, payable in a combination of AFIN common shares and cash plus the assumption of certain debt. The total consideration per share of RCA is purportedly $10.26, based on AFIN's published estimated per share NAV as of December 31, 2015 of $24.17, although that value was approved by its board over 17 months ago, in May 2015.

43.     The Proposed Merger is a roll-up under the definition in RCA's Charter. The Merger Agreement once again is conditioned upon RCA obtaining stockholder approval of Charter amendments designed to eliminate the protections afforded to stockholders by Article XIV of the Charter.

44.     The Proposed Merger provides that   the Advisory Agreement will now be extended to a twenty-year agreement, and further effectively eliminates without a separate stockholder vote, the protections that RCA stockholders currently have against abuse by the Advisor, including the annual approval of its agreement by its independent directors, and its fiduciary duties to both the Company and stockholders.

45.     The Merger Agreement contains a provision requiring RCA to pay a termination fee of approximately $25.6 million to AFIN in the event that RCA fails to complete the Proposed Merger, or $5 million if it is unable to obtain stockholder approval.

46.     The termination fees are, by the terms of the Merger Agreement, "an integral part of the transactions contemplated by this Agreement, and that without these agreements, the other parties would not enter into this Agreement." Merger Agreement §7.4(i).

**The Proposed Merger's Terms Violate the Charter**

47.     In pursuing the Proposed Merger, the Director Defendants have violated their fiduciary duties to the stockholders by causing the Company to violate the terms of its Charter which expressly and unequivocally require that: "In connection with any proposed Roll-Up Transaction, an appraisal of all of the Company's assets shall be obtained from a competent Independent Appraiser," and allows dissenting stockholders to maintain their positions in the Company and or seek appraisal.

48.     The Charter specifically provides that "A summary of the appraisal, indicating all material assumptions underlying the appraisal, shall be included in a report to Stockholders in connection with a proposed Roll-Up Transaction." The Merger Agreement specifically provides that no such report shall be delivered to RCA's stockholders who are, instead, required to vote on eliminating this Charter provision as a condition precedent to effectuating the Proposed Merger without such information. The Director Defendants further approved the Proposed Merger without such appraisal information, necessary to enable them to have made an informed decision within their duty of due care, before approving or even negotiating the Proposed Merger.

49.     The terms of the Proposed Merger also violate the Company's Charter by providing for payment of a termination fee to AFIN in the event the Proposed Merger does not proceed, an action which is expressly prohibited by RCA's Charter.

50.     The Proposed Merger further constitutes a breach of fiduciary duty by the Director Defendants in that the process used to negotiate the Proposed Merger was beset by

disabling conflicts of interest, including those of the Special Committee members, who were beholden to AR Global, and BMO, whose fee was contingent upon the approval of the Proposed Merger.

51.     The Director Defendants relied upon a stale value for AFIN, as further discussed below, in negotiating the terms of the Proposed Merger, despite the fact that its own investment advisor, BMO, in at least one analysis, its NAV analysis, found that AFIN's NAV was below the stale $24.17 value used to negotiate the Proposed Merger, and that the NAV for RCA had increased from the previously announced $9.00 per share NAV, which the Board had approved in December 2015.

52.     Notwithstanding this information, the Director Defendants did not at least negotiate a floor or a range of values in which the Proposed Merger would be completed, or an increase in the cash consideration that would be paid to RCA shareholders in the event of a decrease in AFIN's NAV and an increase in RCA;s NAV.  Instead, they negotiated the Proposed Merger based upon stale financial information to the detriment to Class members, in violation of their duties to act in good faith, with due care and in the best interests of the corporation and its stockholders.

**Defendants Disseminate a Materially False or Misleading Proxy
in Order to Gain Stockholder Approval of the Proposed Merger**

53.     Defendants in the Proxy are seeking the approval of Plaintiffs and other RCA stockholders of proposals to: (a) amend the Charter to delete the Article XIV provisions relating to Roll-Up Transactions; (b) approve the Merger Agreement; and (c) allow the  adjournment of the stockholders' meeting to allow for additional solicitation of stockholder votes.

*The Proxy Contains Materially Misleading Valuations*

54.     The Proxy is materially misleading because it states that the Proposed Transaction is based upon a net asset value ("NAV") of $24.17 per share for AFIN and indicates that this is the valuation of AFIN as of December 2015, without disclosing that this valuation is stale valuation and was approved by the AFIN board in May 2016, months before the vote on the Proposed Merger, and should have been, but was not updated.

55.     Instead, and in conflict with this valuation, in one of the analyses of RCA's investment advisor, BMO suggests that estimated AFIN's current NAV has declined as is in the range of between $20.56-$23.37 per share, or approximately 3-15% below the stated NAV of $24.17 per share. At the same time and without explanation, BMO estimated that RCA's current NAV was within a range of $9.03 to $10.03 per share. UBS, which acted as AFIN's financial adviser without explanation failed to engage in any analysis of AFIN's current NAV.

56.     UBS, instead, derived a standalone discounted cash flow analysis ranging from $13.93 to $28.34 per share, with a midpoint of $19.82, utilizing discount rates ranging from 6.0% to 7.0%. *See* Proxy at 119. In contrast, BMO's standalone discounted cash flow analysis utilized discount rates ranging from 6.4% to 7.8% and arrived at a per share value for AFIN of between $18.34 and $21.68 (*see* Proxy at 128) with a midpoint of $20.01. The Proxy, however, fails to offer any explanation for how UBS and BMO derived such widely different discount rates and valuations for AFIN.

57.     The Proxy also fails to discuss or disclose the reasons why the discounted cash flow analysis for both RCA and AFIN produce materially lower values than their respective an NAV analysis. Accordingly, left undisclosed is the material fact that the terms upon which RCA and AFIN are retaining AR Global to manage the properties of each respective REIT constitutes a material drag on stockholder value.

58.     The Proxy is also materially misleading in describing the "Background of the Merger" is for at least the following reasons:

(a)     It attributes AFIN's failure to obtain a planned listing on the New York Stock Exchange ("NYSE") in the third quarter of 2015 "due to unfavorable market conditions." However, the Proxy fails to disclose the nature of those unfavorable market conditions, *i.e.*, whether they related to all REITs or just REITs under the control of AR Global, and whether or at what point in time those unfavorable market conditions are likely to abate causing Plaintiffs and the other stockholders need to evaluate the likely trading price of AFIN or the newly merged entity in order to determine whether the Proposed Merger represents a superior alternative to liquidating the Company or simply not proceeding with the Proposed Merger;

(b)     It identifies RCA's non-management directors as being "independent" and then part of a "Special Committee" without disclosing that both defendants Rendell and Michelson earn hundreds of thousands of dollars in compensation annually from their directorships with various AR Global affiliated entities;

(c)     Although disclosing that AR Global has an existing financial relationship with BMO, it fails to disclose the magnitude or the nature of that existing financial relationship;

(d)     Although disclosing other potential "Strategic Counterparties" who were involved with discussions with AFIN and RCA, it fails to identify any of those strategic counterparties, any terms proposed with those Strategic Counterparties or the reasons why they were not involved in any transactions with AFIN or RCA;

(e)     Although disclosing the terms upon which BMO purportedly solicited interest from other buyers after the time RCA had already entered into a merger agreement with AFIN , it fails to disclose whether the terms upon which other potential acquirers were solicited

provided for the continued involvement of AR Global receiving fees for the management of RCA's assets (which was one of the terms used when NY REIT, another AR Global controlled REIT that was shopped to potential acquirers, and which would have made the "go shop" a sham);

(f)      Although disclosing that the merger agreement contains a 45 day "go shop" provision, it fails to disclose that the terms utilized by the Company during the go shop period have been determined by other courts in similar circumstances to insufficiently protect the rights of minority stockholders because, among other things, AFIN retained the right to match any proposal made by a potentially competing bidder.

### The Description of the Fairness Opinions Is Materially False and Misleading

59.    The Proxy also contains a financial fairness opinion from BMO, which functioned as RCA's financial adviser in connection with the Proposed Merger, and UBS's opinion on behalf of AFIN.  The description of both fairness opinions is materially false and misleading.

60.    In deriving its fairness opinion, BMO performed three analyses:   a Selected Publicly Traded Companies Analysis; an NAV Analysis, and a Discounted Cash Flow Analysis, to derive a range of implied share prices for both RCA and AFIN.  The description of each of those analyses is materially misleading.

61.    In deriving the Selected Public Companies Analysis, BMO derived multiples for publicly traded REITS, including the share price of these publicly traded REITS, and compared them to the consensus Wall Street research analysts estimated calendar year 2017 FFOs (funds from operations), and the adjusted FFO, and then derived a range of multiples that it then applied to calculate a range of implied equity shares prices for RCN and AFIN.   This analysis is

misleading, however, as the multiples for the publicly traded REITS, which are not disclosed, are not comparable to those of either RCN or AFIN, neither of which is publicly traded.

62.     Further, the Proxy fails to disclose the Street consensus estimates used so that stockholders could make a determination as to whether the share prices used are similar to those of RCN and AFIN.

63.     The Selected Publicly Traded Company Analysis fails to disclose and explain why the chosen multiples range used to determine the implied share price for AFIN is higher than the range of median multiples derived from the selected companies, and what judgments were used to justify a higher range (and therefore a higher implied price for AFIN), particularly when publicly available information indicates that given the ARCP fraud scandal, among other things, AFIN would be trading at a discount, justifying a lower multiple than the median multiple, not a higher one.

64.     The NAV analysis is equally misleading.  In determining the implied NAV for RCN and AFIN, BMO used a blended capitalization rate and applied it to the 2017 estimated net operating income ("NOI") of each entity (adjusted to reflect a property management fee). However, the Proxy fails to disclose the NOI projections relied upon by BMO, which impacts the NAV obtained, and thus omits critical projections necessary to enable stockholders to understand how RCN is projected to perform in the future.  (Notably, AFIN's NAV is still below the value used to calculate the consideration to Class members of the Proposed Merger).

65.     The Discounted Cash Flow analysis is equally misleading.  By way of this analysis, BMO calculated the present value of both RCN and AFIN based upon the unlevered free cash flows of each entity as projected by their respective managements and applied a discount rate.  The unlevered free cash flow projections relied upon by BMO, which are critical

to its analysis, are not disclosed in the Proxy as required, thus disabling stockholders from determining what they are giving up.

66.    UBS similarly performed three analyses:  A Selected Public Companies Analysis, a Selected Precedent Transactions Analysis, and a Discounted Cash Flow Analysis.

67.    As with the BMO Selected Company Analysis, the UBS Selected Public Companies  analysis derives various multiples based upon the enterprise values, and the stock prices of public companies, relative to their 2016 and 2017 estimated EBITDA (earnings before interest, taxes, depreciation and amortization) as determined by FactSet consensus, but then misleading fails to disclose either the multiples for these public companies or the FactSet consensus EBITDAs used, and once again uses selected companies that are publicly traded when neither RCN or AFIN are publicly traded.

68.    Its Selected Precedent Transaction Analysis is equally misleading.  Although UBS uses only three purportedly precedent transactions, for which it once again fails to disclose multiples, it then deduces high, mean, median and low multiples which it then compares to the multiples for the Proposed Transaction (assuming a price of $10.26, which itself is based upon a stale and artificially high value for AFIN, and a price of $8.58, assuming a lower price for AFIN), when it is not possible to derive such multiples solely based upon three transactions. Moreover, the discussion of this analysis does not disclose the multiples for the three precedent transactions so that stockholders can discount any outliers.

69.    Its Discounted Cash Flow analysis for RCN is based upon the discounted net present value of RCN's unlevered free cash flow projections, necessary to enable stockholders to determine the value of the RCN shares which they are giving up, without disclosing the projections upon which they are based.

## CLASS ACTION ALLEGATIONS

70.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2) and (b)(3), individually and on behalf of all other holders of RCA common stock who will vote on the Proposed Merger (the "Class") and/or will otherwise be damaged by the Proposed Merger.  Excluded from the Class are Defendants, and to the extent that they are individuals, their immediate family members, affiliates, heirs, assigns, and agents, and officers of RCA; with respect to RCA, its parent companies and subsidiaries, and any related or affiliated person, firm, trust, corporation, or other entity.  This Action is properly maintainable as a class action for the following reasons:

a)     The Class is so numerous that joinder of all members is impracticable.  As of December 15, 2016, the Company had over 99 million shares of stock outstanding, likely held by hundreds, if not thousands, of beneficial owners.

b)     There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member.   The common questions include, *inter alia*, the following:

i.     whether the disclosures contained in the Proxy violate Section 14(a) of the Exchange Act and SEC Rule 14a-9;

ii.     whether Director Defendants and AR Global are secondarily liable under Section 20(a) of the Exchange Act for RCA's primary violations of Section 14(a) of the Exchange Act;

iii.     whether the Director Defendants breached their fiduciary duties to the Class;

iv.     whether AR Global and AFIN aided and abetted the Director Defendants' breach of fiduciary duty; and

v.      whether Plaintiffs and the other members of the Class will be irreparably damaged if Defendants are not enjoined from the misconduct described above.

71.     Plaintiffs' claims are typical of the claims of the other members of the Class in that all members of the Class will be damaged alike by the wrongs complained of herein.

72.     This class action is a fair and efficient method of adjudicating the claims of Plaintiffs and the other Class members for the following reasons:  (a) common questions of law and fact predominate over any question affecting any individual Class member; (b) the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, thereby establishing incompatible standards of conduct for Defendants or would allow the claims of some members of the Class to adversely affect other Class members' ability to protect their interests, or adjudications with respect to individual members of the Class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; (c) this forum is appropriate for litigation of this action since a substantial portion of the transactions, acts, events, and omissions alleged herein occurred in this District; (d) Plaintiffs anticipate no difficulty in the management of this action as a class action; and (e) the Class members are readily definable, and prosecution as a class action will eliminate the possibility of repetitious litigation, while also providing redress for claims that may be too small to support the expense of individual, complex litigation.

73.     Plaintiffs are committed to prosecuting this action and have retained competent counsel experienced in litigation of this nature.  Plaintiffs are adequate representatives of the Class.

74.     Defendants have acted and will continue to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Class as a whole.

75.     For these reasons, a class action is superior to other available methods for the fair and efficient adjudication of this controversy. .

## COUNT I

## VIOLATIONS OF EXCHANGE ACT SECTION 14(a) AND SEC RULE 14a-9

76.     Plaintiffs incorporate and reallege all the allegations contained in the preceding paragraphs as if fully set forth herein.

77.     The contents and the distribution of the Proxy have been approved by the Board and thus by each Director Defendant.

78.     Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a), provides that "[i]t shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. §78l]."

79.     SEC Rule 14a-9, promulgated pursuant to Section 14(a), prohibits the issuance of any proxy statement "which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy or

the same meeting or subject matter which has become false or misleading." 17 C.F.R. §240.14a-9(a).

80.    RCA, AFIN and the Director Defendants issued and disseminated the false and misleading Proxy which fails to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, and/or omits material information.  The Defendants named in this Count are soliciting Plaintiffs and the Class to vote on the Proposed Merger through the Proxy.  A stockholder vote is required to approve the Proposed Merger and the other proposals contained in the Proxy which are an essential causal link to the consummation of the Proposed Merger.

81.    As a result of the Proxy containing material misrepresentations and/or omissions, Plaintiffs and the other members of the Class have suffered and will suffer substantial harm.

82.    The facts misrepresented and/or omitted in the Proxy are material because under all the circumstances there is a substantial likelihood that a reasonable stockholder would consider these false and misleading statements of fact or omitted facts important in deciding how to vote on the Proposed Merger and other proposals contained in the Proxy and would consider these facts a material part of the mix of information available to Plaintiffs and the Class in deciding how to vote.

83.    As a direct and proximate result of the issuing of the false and materially misleading Proxy by the Company and the Director Defendants, Plaintiffs and the other members of the Class have suffered and will suffer damages in connection with the proposals being made in the Proxy including that relating to approving the Proposed Merger.

84.     By reason of the misconduct alleged herein, the Company and the Director Defendants are liable to Plaintiffs and the other members of the Class pursuant to §14(a) of the Exchange Act and Rule 14a-9.

85.     The violations of §14(a) and Rule 14a-9 by the Director Defendants and the Company entitle Plaintiffs to injunctive relief because Plaintiffs and the other members of the Class will suffer irreparable injury absent an injunction in that the stockholder voting procedures have been impermissibly infected, the threatened injury to the moving party outweighs any damage to the opposing party, the injunction, if issued, will not be adverse to the public interest, and a substantial likelihood exists that Plaintiffs will prevail on the merits.

## COUNT II

## VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT

86.     Plaintiffs incorporates and reallege all the allegations contained in the preceding paragraphs as if fully set forth herein.

87.     The Director Defendants and AR Global acted as controlling persons of RCA within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false and misleading Proxy filed by the Company with the SEC and disseminated to the investing public, the Director Defendants and AR Global had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of various statements in the Proxy which Plaintiff alleges are false and misleading.

88.     The Director Defendants and AR Global were provided with or had access to copies of the Proxy alleged by Plaintiffs to be false and/or misleading prior to and/or shortly after it was issued and had the ability to prevent the issuance of the false and/or misleading statements therein or cause the statements to be corrected.

89.     In particular, each of the Director Defendants and AR Global had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercise the same.

90.     As set forth above, the Company violated Section 14(a) and Rule 14-9 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Director Defendants and AR Global are liable pursuant to Section 20(a) of the Exchange Act.

## COUNT III

## BREACH OF FIDUCIARY DUTIES AGAINST THE DIRECTOR DEFENDANTS

89.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above as if set forth fully herein.

90.     The Director Defendants are all directors of the Company and, in that capacity, owed fiduciary duties to act in good faith, in a manner each director reasonably believes to be in the best interests of the corporation for which he serves, and with the care that an ordinarily prudent person in a like position would use under similar circumstances under Section 2-405.1(c).

91.     The Director Defendants breached their fiduciary duties as set forth in Section 2-405.1, and are not entitled to the business judgment presumption as they acted in bad faith,

without due care and in a manner that was not reasonable including, *inter alia*, favoring the interests the interests of AR Global and its affiliates, including AFIN, to the detriment of the Company and its minority stockholders and failing to comply with the terms of the Company's Charter, acting in furtherance of their own personal, pecuniary interests, and failing to act with due care and with sufficient information to determine whether the Proposed Merger rather than an orderly liquidation of the Company, among other alternatives, constituted a fair and reasonable method for liquidating the Company.

92.     As a direct and proximate result of these breaches, the Class has been damaged.

## COUNT IV

### AIDING AND ABETTING
### A BREACH OF FIDUCIARY DUTIES AGAINST AR GLOBAL AND AFIN

97.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above as if set forth fully herein.  Plaintiffs assert this claim derivatively on behalf of the Company against defendants AR Global and AFIN.

98.     Defendant AR Global as the Company's advisers and ultimate controllers and affiliates of AR Global, including defendant AFIN, knowingly participated in and/or provided substantial assistance to the Director Defendants' breaches of their fiduciary duties.

99. As a direct and proximate result of defendants AR Global and AFIN's aiding and abetting the Director Defendants' breaches, the Company has been damaged.

**WHEREFORE,** Plaintiffs demand judgment as follows:

A.     Declaring this Action to be a proper class action and naming Plaintiffs as Class representatives;

B.      Preliminarily and permanently enjoining the Proposed Merger or any vote pursuant to a materially misleading proxy;

C.      In the event the Proposed Merger is consummated, rescinding the transaction and awarding rescissory damages;

D.      Ordering Defendants to pay to Plaintiffs and to other members of the Class all damages suffered and to be suffered by them as the result of the acts and transactions alleged herein;

E.      Awarding Plaintiffs the costs and disbursements of this action, including allowances for Plaintiff's reasonable attorneys' and experts' fees; and

F.      Granting such other and further relief as may be just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all such issues so triable.

Dated: January 13, 2017

TYDINGS & ROSENBERG LLP

John B. Isbister, Federal Bar No. 00639
jisbister@tydingslaw.com
Daniel S. Katz, Federal Bar No. 01148
dkatz@tydingslaw.com
100 East Pratt Street, 26th Floor
Baltimore, MD  21202
Tel. (410) 752-9700
Fax (410) 727-5460

Attorneys for Plaintiffs

OF COUNSEL FOR THE PLAINTIFFS

**THEGRANTLAWFIRM, PLLC**
Lynda J. Grant
521 Fifth Avenue, 17th Floor
New York, NY 10175
Telephone: (212) 292-4441
Facsimile: (212) 292-4442
lgrant@grantfirm.com

**ABRAHAM, FRUCHTER &**
**TWERSKY, LLP**
Jeffrey S. Abraham
One Penn Plaza, Suite 2805
New York, NY 10119
Tel: (212) 279-5050
Fax:(212) 279-3655
JAbraham@aftlaw.com

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

Ira Gaines ("Gaines"), as a trustee on behalf of the Paradise Wire & Cable Defined Benefit Pension Plan, and the Ira J. Gaines Revocable Trust, as managing partner of the Hollingsworth, Mendenhall and McFadden LLC, and as sole shareholder of IG Holdings, Inc. ("Plaintiffs") declares:

1.      I am the sole beneficiary and trustee of Paradise Wire & Cable Defined Benefit Pension Plan, and the Ira J. Gaines Revocable Trust, the manager and sole member of Hollingsworth, Mendenhall and McFadden, LLC and the sole shareholder of IG Holdings, Inc. ("Plaintiffs").

2.      I have reviewed the Class Action Complaint ("Complaint") regarding American Realty Capital – Retail Centers of America, Inc. and have authorized its filing on behalf of Plaintiffs.

3.      Plaintiffs did not acquire the security that is the subject of this action at the direction of Plaintiffs' counsel or in order to participate in this private action or any other litigation under the federal securities laws.

4.      Plaintiffs are willing to serve as a representative parties on behalf of the Class (as defined in the Complaint), including providing testimony at deposition and trial, if necessary.

5.      Plaintiffs have made the following transaction(s) in the securities that are the subject of this action:

**Hollingsworth, Mendenhall and McFadden, LLC**

| DATE ACQUIRED | NUMBER OF UNITS/SHARES |
|---|---|
| 4/8/2016 | 5568.375 |
| 9/13/2016 | 102.890 |

**Paradise Wire and Cable DBPP**

| DATE | NUMBER OF UNITS/SHARES |
|------|------------------------|
| 6/3/2016 | 1682.821 |
| 8/11/2016 | 18.996 |

**IG Holdings, Inc.**

| DATE | NUMBER OF UNITS/SHARES |
|------|------------------------|
| 10/25/2016 | 3660.38 |

**Ira J. Gaines Revocable Trust**

| DATE | NUMBER OF UNITS/SHARES |
|------|------------------------|
| 11/18/2016 | 10,000 |

6.    Plaintiffs have not sought to serve or served as representative parties in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification.

7.    The Plaintiffs will not accept any payment for serving as representative parties on behalf of the Class beyond the Plaintiffs' pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _13th_ day of January 2017.

_____
                                    Ira Gaines

2