## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| PARADISE WIRE & CABLE DEFINED BENEFIT PENSION PLAN, HOLLINGSWORTH, MENDENHALL AND MCFADDEN LLC, IG HOLDINGS, INC., AND IG REVOCABLE TRUST, individually on behalf of themselves and all others similarly situated, | Civil Action No. 1:17-cv-00132-CCB |

Civil Action No. 1:17-cv-00132-CCB

**AMENDED COMPLAINT**

**CLASS ACTION**

**JURY TRIAL DEMANDED**

Plaintiffs,

DR. STUART WOLLMAN
50 Spruce Drive
Roslyn, NY 11576

Lead Plaintiff,

SHEILA ROSENBERG
7 Spring Hollow
Roslyn, NY 11576

RENE DeMEULE
4052 N. 2250 E.
Filer, Idaho 83328

Additional Plaintiffs,

v.

EDWARD M. WEIL, JR., et al.,

Defendants,

NICHOLAS RADESCA
c/o American Finance Trust, Inc.
405 Park Avenue
New York, NY 10022

DAVID GONG
c/o American Finance Trust, Inc.
405 Park Avenue
New York, NY 10022

STANLEY PERLA
c/o American Finance Trust, Inc.
405 Park Avenue
New York, NY 10022


LISA D. KABNICK
c/o American Finance Trust, Inc.
405 Park Avenue
New York, NY 10022


                    -and-



AMERICAN REALTY CAPITAL RETAIL
ADVISOR, LLC
405 Park Avenue
New York, NY 10022
Serve on Resident Agent:
CORPORATION SERVICE COMPANY
251 Little Falls Drive
Wilmington, DE 19808

                              Additional Defendants.

        Lead Plaintiff, Dr. Stuart Wollman ("Dr. Wollman" or "Lead Plaintiff") and Plaintiffs

Paradise Wire & Cable Defined Benefit Pension Plan, Hollingsworth, Mendenhall and

McFadden LLC, IG Holdings, Inc., IG Revocable Trust, Sheila Rosenberg and Rene DeMeule

(together with Dr. Wollman, the "Plaintiffs")  by their  attorneys, allege the following upon

personal knowledge as to themselves and their own acts, and upon information and belief as to

all other matters derived from, *inter alia*, counsel's review of documents filed with the U.S.

Securities and Exchange Commission ("SEC"), by American Realty Capital – Retail Centers of

America, Inc. ("RCA" or the "Company"), American Finance Trust, Inc. ("AFIN") and other

entities controlled by AR Global Investments LLC ("AR Global"), news reports, statements by a securities' analyst, court filings,  and other  publicly available news sources:

## SUMMARY OF THE ACTION

1.      This is a class action arising from the merger (the "Merger") between RCA and AFIN, each of which was one of several non-publicly traded real estate investment trusts ("REIT") controlled and managed by defendant AR Global.  The consideration that Plaintiffs and the other RCA shareholders received in the Merger, consisting almost entirely of AFIN stock, was inadequate and unreasonable because it was based upon an overvaluation of AFIN and an undervaluation of RCA and its underlying real estate assets.

2.      The Merger, instead of being driven by a desire to obtain the best available price or even a fair price for RCA shareholders, was motivated by Defendants' desire to secure and guarantee future revenue for AR Global after it had suffered from a number of scandals and was no longer able to syndicate and manage new non-traded REITs.  Additionally, several REITs had recently discharged AR Global as their asset manager, costing AR Global the fees earned thereby; the Merger was designed to lock RCA's assets into the 20 year management agreement governing AFIN rather than the freely terminable management agreement governing AR Global's management of RCA.

3.      AR Global orchestrated both sides of the Merger "negotiations" through a flawed process in which RCA's two non-management directors of RCA designated themselves as a special committee (the "Special Committee" or "Committee") purportedly representing the interests of RCA's shareholders.  In fact, the Special Committee was not independent from AR Global and even (unsuccessfully) attempted to eliminate provisions of RCA's certificate of incorporation (the "Charter") designed to protect RCA shareholders.  Defendants then

3

purportedly secured a bare majority vote of RCA's shareholders to approve the Merger and a related Charter amendment eliminating certain shareholder rights, through a Joint Proxy Statement/Prospectus (the "Proxy" or "Prospectus") filed with the SEC on December 16, 2016. The Proxy, however, was materially false or misleading in, among other things, relying upon a stale and inflated Net Asset Value ("NAV") for AFIN, a misleading description of the state of AFIN's business, inaccurate projections for RCA, and material facts relating to the background of the Merger.

4.      On February 15, 2017, two days after the shareholder vote on the Merger, *The Stanger Report,* a highly respected industry publication, published an article entitled "St. Valentine's Day Massacre", which aptly described the damage inflicted on RCA shareholders through the Merger by stating that:

> Yesterday's St. Valentine's Day Massacre redux involved numerous men, some dressed as proxy solicitors, who lined retail investors in … [RCA] up against a wall of sophisticated jargon and hit them with thousands of mailings and telephone calls to approve a merger with … [AFIN] in a transaction which likely will ultimately cripple the value of the RCA investors' holdings.  When the smoke cleared, the RCA investors narrowly approved the merger with 50.21% voting for it and 50.02% supporting a necessary charter amendment.

> \*      \*      \*

> The [Merger] is one for the ages in terms of assaults on the sensibilities of investors.  The investors are now at the mercy of an apparently conflicted board and an onerous management agreement with a brutal exit clause that will likely overhang the value of the merged entity.  The only remaining safety valve may be a pending class action lawsuit that may seek to recover the damages inflicted upon the RCA investors.

5.      This case is the class action identified by *The Stanger Report* that seeks to recover those damages inflicted on RCA shareholders.

## PARTIES

**Plaintiffs**

6.      Lead Plaintiff, Dr. Stuart Wollman, as set forth in the certification previously filed with the Court, purchased shares of RCA common stock that he owned at the time the Proxy was disseminated and received shares of AFIN issued pursuant to the Prospectus in the Merger.

7.      Plaintiffs Paradise Wire & Cable Defined Benefit Pension Plan, Hollingsworth, Mendenhall and McFadden LLC, IG Holdings, Inc., and IG Revocable Trust as set forth in the certification previously filed with this Court, purchased shares of RCA common stock that they owned at the time the Proxy was disseminated and received shares of AFIN issued pursuant to the Prospectus in the Merger.

8.      Plaintiff Sheila Rosenberg, as set forth in the certification she previously signed and which is attached hereto, purchased shares of RCA common stock that she owned at the time the Proxy was disseminated and received shares of AFIN issued pursuant to the Prospectus in the Merger.

9.      Plaintiff Rene DeMeule, as set forth in the certification previously filed with this Court, purchased shares of RCA common stock which he owned at the time the Proxy was disseminated and received shares of AFIN issued pursuant to the Prospectus in the Merger.

**AR Global Defendants**

10.      Defendant AR Global, which was previously known as AR Capital, LLC ("AR Capital"), maintains its corporate headquarters at 405 Park Avenue, New York, NY 10022.  AR Global describes itself as an alternative asset manager with an emphasis on real estate investments, having over $18 billion of real estate and loans under management.

11.     Defendant American Realty Capital Retail Advisor, LLC (the "RCA Advisor"), another indirect wholly owned subsidiary of AR Global, managed the affairs of the operating partnership through which the Company owns its assets.  The Company paid the RCA Advisor an Asset Management Fee (as defined in an advisory agreement or the "Advisory Agreement") equal to 0.0625% per month of the estimated net asset value per share of common stock as compensation for services rendered in connection with the management of its assets.  In the first 9 months of 2016, RCA paid $6.7 million to the RCA Advisor.  As part of the Merger, the RCA Advisor received a redemption payment based on the AFIN $24.17 NAV used in the Merger.

12.     Defendant Weil was at all times relevant to this action the Company's Chief Executive Officer ("CEO"), President and Chairman of the Board, and is, and at all relevant times, was, the CEO, President and Chairman of the Board of AFIN.  In addition, Weil serves as the CEO of defendant AR Global.

**RCA and The Special Committee Defendants**

13.     Defendant RCA was a Maryland corporation organized as a real estate investment trust for U.S. federal income tax purposes and maintained its principal place of business at 405 Park Avenue, 14th Floor, New York, NY.  RCA's securities were registered with the SEC pursuant to Section 12 of the Securities Exchange Act of 1934 (the "Exchange Act") but were not listed for trading on any securities exchange.  RCA had no employees and retained the RCA Advisor to manage the day-to-day operations of American Realty Capital Retail Operating Partnership, L.P. (the "OP"), the operating partnership that owns RCA's real estate assets.  The RCA Advisor, in turn, sub-contracted with Lincoln Retail REIT Services, LLC ("Lincoln"), an independent third party, to provide real estate-related services, including locating investments,

negotiating financing, and providing property-level asset management services, property

management services, leasing and construction oversight services and disposition services.

14.     Defendant Michelson, at the times relevant to this action, was a member of

RCA's board of directors (the "RCA Board") and was designated by the Company as the "Lead

Independent Director" and as Audit Committee Chair.  Michelson, however, in truth and fact,

was not independent.  Instead, at all relevant times, Michelson also served as a purportedly

independent director of the following entities managed or advised by defendant AR Global:

Health Trust, Inc. ("HTI"); Business Development Corporation of America ("BDCA"); Business

Development Corporation of America II ("BDCA II"); and Realty Capital Income Funds Trust

("RCIFT").  Since 2009, he has sat on the boards or been a trustee of a total of 12 AR Global

related entities.  From his service on the Company's board alone, Michelson earned over

$100,000 per year, and his combined compensation from all AR Global entities is believed to

exceed $500,000 per year, a primary source of his personal livelihood.  Michelson has received

at least $2.2 million for his services as a director of AR Global managed entities over the past

four years.

15.     Defendant Rendell, at the times relevant to this action, was designated by RCA as

a purportedly independent director of the Company.  Rendell, however, in truth and in fact, was

not independent.  Instead, Rendell also served as a purportedly independent director of the

following entities managed or advised by AR Global: Global Net Lease, Inc.; HTI; BDCA; and

BDCA II.  Since 2012, he has sat on the boards or been a trustee of seven AR Global related

entities.  From his service on the Company's board alone Rendell earned over $100,000 per year,

and his combined compensation from all AR Global entities is believed to exceed $500,000 per

year, a primary source of his personal livelihood. Rendell has received at least $2.2 million for his services as a director of AR Global managed entities over the past four years.

16.     Defendants Weil, Michelson and Rendell are collectively referred to herein as the "Director Defendants".

**AFIN Defendants**

17.     Defendant AFIN is a Maryland corporation organized as a REIT with a principal place of business at 405 Park Avenue, New York, NY.  AFIN, prior to the Merger, owned a diversified portfolio of commercial properties primarily comprised of freestanding single-tenant properties that are net leased to investment grade and other creditworthy tenants.  All of AFIN's properties are managed by American Finance Properties, LLC, an indirect wholly-owned subsidiary of AR Global.  AFIN's executive officers are employees of affiliates of the AFIN Advisor including defendant Weil who is AFIN's chief executive officer and the chairman of its Board.  American Finance Advisors, LLC (the "AFIN Advisor"), an indirect wholly-owned subsidiary, manages the affairs of AFIN.  In 2016, AFIN paid $18 million in management fees to the AFIN Advisor.

18.     Defendant Nicholas Radesca ("Radesca"), at all relevant times, was the Chief Financial Officer, Secretary and Treasurer of AFIN.  Radesca signed the Registration Statement.

19.     Defendants David Gong ("Gong"), Stanley R. Perla ("Perla") and Lisa D. Kabnick ("Kabnick") are each directors of AFIN and either individually or through an attorney-in-fact signed the Registration Statement.  Gong prior to the time of the Merger negotiations had also served as a member of the RCA Board.

20.     Defendants Weil, Radesca, Gong, Perla, Kabnick and AFIN are collectively referred to herein as the "AFIN Defendants."

## JURISDICTION AND VENUE

21.     This Court has jurisdiction over  this action under federal question jurisdiction

pursuant to 28 U.S.C. §1331 because this action arises under the laws of the United States,

Section 27 of the Exchange Act, 15 U.S.C. §78aa, because this action asserts claims under

Sections 13, 14(a) and 20(a) of the Exchange Act, 15 U.S.C. §§78m, 78n(a) and 78t(a), and

Section 22(a) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §77v(a) because this

action asserts claims arising under Sections 11, 12 (a)(2) and 15 of the Securities Act, 15 U.S.C.

§§ 77k, 77i(a)(2) and 77o.  In addition, The Court has supplemental jurisdiction pursuant to 28

U.S.C. §1367 over the claims which arise under state law.

22.     The Court has personal jurisdiction over each Defendant pursuant to Section 27 of

the Exchange Act, Section 22(a) of the Securities Act and because the Company is either a

corporation that conducts or has transacted business in and/or maintains operations in this

District.  In addition, the Director Defendants are individuals who are either present in this

District for jurisdictional purposes or have had sufficient minimum contacts with this District by

way of the business they conduct with the Company, as to render the exercise of personal

jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

23.     Venue is proper pursuant to 28 U.S.C. §1391 because defendants RCA, AR

Global and AFIN were organized in this District and a substantial part of the events, acts and

omissions giving rise to Plaintiffs' claims occurred in this District.  In addition, the Company has

adopted a forum selection clause in its by-laws providing for litigation of these claims in this

District.

## SUBSTANTIVE ALLEGATIONS

### The Company

24.     RCA was incorporated on July 29, 2010 as a Maryland corporation and qualified as a REIT for U.S. federal income tax purposes beginning with the taxable year ended December 31, 2012.  RCA was a non-traded, externally-advised REIT with a focus on acquiring a diversified portfolio of anchored, stabilized core retail properties, including power centers and lifestyle centers in the United States.

25.     On March 17, 2011, RCA commenced an initial public offering (the "IPO") on a "reasonable best efforts" basis of up to 150 million shares of common stock, $0.01 par value per share, at a price of $10.00 per share, subject to certain volume and other discounts.  RCA closed the IPO on September 2013, and through that offering and its dividend reinvestment plan, raised approximately $983.8 million in total gross proceeds through December 15, 2016.  The Company is required to engage in a transaction creating liquidity for stockholders within six years of the completion of its IPO.

26.     Since the IPO, RCA, with the assistance of Lincoln, has acquired a diversified portfolio of anchored, stabilized core retail properties, including power centers, lifestyle centers, grocery-anchored shopping centers.  RCA has also pursued a publicly stated strategy of financing its portfolio opportunistically at a target leverage level of not more than 50% loan-to-value.  Key to RCA's stated investment strategy was its stated intention "to maximize stockholder total returns through a highly disciplined acquisition strategy, ***with a constant view towards a seamless and profitable exit***."  RCA 2015 Form 10-K at p.2 (emphasis added).

27.     RCA owned substantially all of its real estate assets through the OP which, in turn, employs the RCA Advisor, an entity that is an indirect wholly-owned subsidiary of AR Global, to manage the day-to-day business of the Company.  The RCA Advisor, in turn,

10

maintains a service agreement with Lincoln, an independent third party, which provides, subject to the RCA Advisor's oversight, real estate-related services, including locating investments, negotiating financing, and providing property-level asset management services, property management services, leasing and construction oversight services and disposition services.

**AR Global's Business Model is Threatened by Irregularities in its Operations**

28.     AR Global previously engaged in a lucrative business model, through which it syndicated non-publicly traded REITs.  The fees AR Global received from the sale of newly created REITs was substantial.  Thus, in the case of AFIN, an indirect wholly-owned subsidiary of AR Global received 3.0% of the sales price and another indirect wholly-owned subsidiary of AR Global received 2.0% of the sales price as a purported reimbursement for operational and organizational expenses.  AFIN raised a total of $2.04 billion in its offering allowing AR Global to collect more than $100,000,000 in fees.  Similarly, AR Global collected more than $50,000,000 in fees from the sale of RCA stock.

29.     AR Global's ability to syndicate new REITs has been effectively foreclosed by the disclosure of facts casting serious doubt on the integrity of its operation.  The first of these events occurred in or about October 29, 2014, when ARCP, the lead and largest company in the AR Global corporate empire, disclosed an accounting fraud that resulted in the indictment of several its key officers.  *See U.S. v. Block*, No. 16-CRIM-595 (S.D.N.Y.).

30.     An example of how this disclosure affected the operations of AR Global was seen in or about September 2015, when AR Global terminated an offering of American Realty Capital – Retail Centers of America II ("RCA II"), a new entity it had created with an investment program similar to that of RCA.  AR Global had planned to sell as much as 125,000,000 shares of RCA II at $25.00 per share to investors on a "reasonable best efforts basis," for total proceeds

of up to $3 billion.  However, according to the last Form 10-Q filed by RCA II with the SEC, AR

Global had only succeeded in selling 14,220 shares of RCA II to investors for proceeds of a little

more than $350,000.

31.     Another damaging disclosure occurred in November 2015, when an AR Capital

affiliate, Realty Capital Securities ("RCS"), AR Global's brokerage services company through

which it sold REIT units, was charged by the Massachusetts Securities Division with fraudulent

casting of shareholder proxy votes with "registered agents of Realty Capital Securities . . .

[having] impersonated shareholders, fabricating proxy votes."  Less than one month later, RCS

entered into a $3 million settlement to resolve the matter, and agreed to shut down its

Massachusetts operations and withdraw its broker-dealer license in all other state and federal

jurisdictions.

32.     After these disclosures, many of the REITs managed by AR Global subsidiaries

terminated their advisory agreements with AR Global affiliates.  For example, Phillips Edison

Grocery Center REIT II terminated its advisory agreement on December 3, 2015, and United

Development Funding Income V terminated its advisory agreement on April 4, 2016.  Those

terminations were enabled by a provision contained in their charters, similar to the one contained

in RCA's certificate of incorporation (the "Charter") allowing the independent directors to

terminate the asset management agreements without cause on 60 days' notice.

33.     AR Global responded to these challenges to its business model by seeking to

merge or roll-up its affiliated REITs having freely terminable management agreements into those

having longer management agreements that were more difficult, if not virtually impossible to

break.  Thus, according to an April 26, 2016 *Investment News* article titled "Schorsch's AR

Global looking to consolidate $10.5 billion of REITs," AR Global's plan was for AFIN and

Global Net Lease Inc. to "purchase five other real estate companies managed by AR Global….

Mr. Schorsch and William Kahane are the controlling partners of AR Global, which in turns

controls the adviser to each of the seven REITs in the potential roll ups."  As discussed in the

article:

> Through its advisers, AR Global generates fees and income by acquiring and
> managing properties on behalf of the REITs, said Brad Thomas, editor of
> Forbes Real Estate Investor.  "The investor doesn't get paid a fee every time
> the REIT buys a property, but the management does."
>
> The flurry of mergers, if successful, would put more assets under the roofs of
> the two REITs, which have unusual, difficult to break 20-year advisory
> contracts with AR Global, said industry sources, including former AR Global
> employees.  AR Global does not have the 20-year advisory agreements with
> the other REITs it manages, observers said.
>
> That means AR Global, as the manager of two larger REITs, would create a
> larger source of fee revenue over a long period of time, benefitting Mr.
> Schorsch and his partners, those sources said.

34.    AR Global's hunger for management fees was so great that even when such a

related party merger was unavailable, it still sought out avenues to extend the life of its advisory

agreements and related lucrative management fees.  For example, on or about May 25, 2016,

New York REIT, Inc. ("NY REIT"), another AR Global controlled REIT, which is publicly

traded, rather than liquidating as originally planned, attempted to engineer a merger transaction

designed to preserve AR Global's lucrative management fees.  NY REIT was ultimately forced

to withdraw that merger proposal based upon vigorous opposition from institutional

stockholders, one of whom launched a proxy contest designed to unseat the board of directors.

35.    Robert Froelich ("Froelich"), a former independent director of two other AR

Global managed entities, Realty Finance Trust, Inc. ("RFT"), and HTI, resigned in the face of

AR Global's roll up plans based upon his opinion that in violation of good corporate governance,

the RFT board had refused to hire an outside third party to consider strategic alternatives to the roll up.  Froelich stated in a letter to the RFT board:

> Much to my shock and surprise, the majority of the board did not concur with my assessment [of considering other alternatives], which, in my mind, calls into question the quality of corporate governance exercised by the board of directors of [Realty Finance Trust].

**AFIN Seeks to Acquire RCA as Part of AR Global's Roll-Up Plan**

36.    On February 16, 2016, Gong, the lead independent director of AFIN and a former RCA board member, sent a letter to the non-management directors of the Board inviting RCA to commence discussions relating to a possible business combination.  On February 26, 2016, UBS Securities LLC ("UBS"), an investment advisor retained by the AFIN's independent directors, delivered a letter on their behalves to the non-management directors of RCA providing further details on a proposed transaction.  The parties purportedly entered into a mutual nondisclosure agreement effective as of March 2, 2016 that enabled AFIN to access nonpublic information about RCA.  This nondisclosure agreement was primarily for the sake of appearance since AR Global already controlled and had access to all information about both entities.

37.    On March 14, 2016, RCA's non-management directors, Michelson and Rendell, calling themselves a "Special Committee," retained BMO to provide financial advice and assistance in connection with AFIN's proposed transaction.  The Committee retained BMO despite the existence of BMO's extensive conflicts arising from its existing and extensive financial relationship with AR Global.  Compounding those conflicts, the Special Committee structured its retention of BMO to incentivize it to opine in favor of the Merger by agreeing to pay BMO $1.0 million upon the delivery of its opinion and an additional $4.9 million upon the closing of the Merger.  *See* Proxy at 128.

38.     On April 2, 2016, the independent directors of AFIN purportedly made their initial proposal to acquire each share of RCA common stock for 0.365 shares of AFIN common stock ($8.82 based on AFIN's published per share NAV of $24.17 as of December 31, 2015) and $0.98 in cash (the "April 2 Offer Letter").   The offer was subject to a financing contingency.

39.     On May 17, 2016, AFIN's special committee purportedly sent another non-binding letter to the Committee proposing the same $9.80 per share consideration it had proposed in its April 2 Offer Letter, consisting of the same combination of AFIN stock (at a 0.365 exchange ratio) and cash ($0.98).   AFIN sent this letter to communicate that the pricing in its April 2 Offer Letter remained unchanged following its review of financial information posted to RCA's electronic data room.   The letter also indicated that the Merger would not be subject to a financing contingency and would include (a) a 45-day go shop period, (b) a "fiduciary out" that would allow RCA to terminate any resulting agreement to accept a superior proposal, and (c) a two-tiered termination fee of 0.5% and 2.5% of the equity value of the transaction with the lower fee applicable to any termination resulting from a superior proposal during the go shop period – offers that AFIN could make given AR Global's announced intention to roll up a number of its entities, an announcement that would have discouraged other bidders.   The letter further expressed a willingness to explore adding new directors to AFIN's Board.

40.     On June 8, 2016, the Company issued a press release disclosing that the Board had earlier established the Special Committee comprised of its non-management directors whom the press release characterized as "independent," in response to its receipt of a purportedly unsolicited proposal from AFIN.   According to the press release, the Committee was established to consider, review and evaluate the Merger and, if deemed appropriate, to negotiate the terms of the Merger.   The press release, however, stated that the Committee had not undertaken, and was

not authorized to undertake, a broader review of the Company's strategic alternatives other than in connection with the Merger or any potential conflicts of interest that might arise out of or result from the Merger.

41.     On June 14, 2016, the Committee approved a counter-proposal containing the following terms: (i) per share consideration to RCA shareholders of 0.385 shares of AFIN common stock and $0.95 in cash and (ii) amendments to the AFIN Advisory Agreement.  The proposed amendments provided for: (a) a 10-year term subject to two successive five-year renewal terms absent a non-renewal election; (b) a performance-based termination right; and (c) a termination right tied to fees under the agreement ceasing to be fair.  The Committee determined that proceeding with the transaction on the terms outlined in the counterproposal would be more beneficial to RCA than the alternatives considered.

42.     Although no price check had yet been agreed upon, and the amount of consideration was only $0.26 more than the price at which the shares had been offered, the "Special Committee" concluded that "conducting a broad market check was not necessary, given the relatively low likelihood that other strategic or private buyers would pay a greater price than AFIN was currently offering based on the then-current market conditions in the REIT sector." Proxy at 99.

43.     On June 17, 2016, representatives of UBS communicated, on behalf of the AFIN Special Committee, a response to the Committee's counterproposal, accepting RCA's requested consideration per share and indicating that the AFIN Advisor had informed the AFIN Special Committee that it was unwilling to amend the AFIN Advisory Agreement.

44.     On June 28, 2016, the Committee sent a letter to the AFIN Special Committee confirming the Committee's earlier proposal of a 0.385 exchange ratio and $0.95 in cash

(previously accepted by the AFIN Special Committee) and further proposed: (i) no change to the

fees payable under the AFIN Advisory Agreement; (ii) no change to the existing 20-year term;

(iii) acceptance of the change of control termination right and related termination fee proposed

by the AFIN Advisor subject to use of the current fee levels in computation of the termination

fee; and (iv) a performance-based termination right.  The performance-based termination right

would have entitled AFIN to terminate the AFIN Advisory Agreement by a two-thirds vote of its

independent directors upon payment of a termination fee equal to 50% of the proposed change of

control termination fee.

     45.     On July 6, 2016, Defendant Weil, in his capacity as the CEO of the AFIN

Advisor, sent a letter to the Committee proposing inclusion in the AFIN Advisory Agreement of

an option on the part of the AFIN Board to elect to internalize the management of AFIN upon

specified conditions: (i) a unanimous vote in favor of internalization by the independent

directors; (ii) no election to internalize before January 1, 2018; (iii) one-year advance notice of

the effective date of the internalization; and (iv) payment of an internalization fee.  The proposed

internalization fee would equal 4.5 times the sum of all gross management fees, incentive fees

and reimbursables received by the AFIN Advisor on a current run rate, annualized basis under

the existing AFIN Advisory Agreement if internalization occurred from January 1, 2018 through

December 31, 2028.  A multiple of 3.5 would be used to calculate the internalization fee if

internalization occurred thereafter.  If AFIN were contemplating a strategic transaction prior to

the effective date of the internalization, then the fee base to which the 4.5 multiple or 3.5

multiple would apply would also include the fees that would have been payable to the AFIN

Advisor in the one-year period following the close of such strategic transaction had the

internalization not occurred.  In addition, the internalization would also trigger a $15 million

payment on account of discontinuance costs for transfer of intellectual property, information technology and related assets and services.

46.     The response letter also proposed an increase in the base management fee effective upon closing of the RCA merger, with the amount of the increase being fixed at $6 million in the first year after the closing; $7 million in the second year; and $8 million in and after the third year.

47.     Finally, the response letter also provided for one of the current directors of RCA to join the AFIN Board at closing of the merger.  According to the January 3, 2017 edition of *The Stanger Report* entitled "Bottom of the Ninth – RCA Investors At Bat: Will AFIN and ARC Global 'Pitch' the Perfect Game," the internalization fee could exceed $100 million.

**Defendants Fail in Their Efforts to Eliminate RCA**
**Charter Provisions Designed to Protect RCA Shareholders**

48.     In an effort to pave the way for the Merger, on April 29, 2016, the RCA Board disseminated a proxy (the "April 2016 Proxy"), seeking to eliminate many provisions of the RCA Charter designed to protect the rights and economic interests of RCA shareholders including their right to seek an appraisal of their shares in the event of a roll up, such as the Merger.

49.     The Charter provisions that Defendants sought to eliminate included Article VIII which, among other things: (i) limited the length of any advisory agreement to one year, (ii) capped  the RCA Advisor's compensation; (iii) required the RCA Board to review the RCA Advisor's performance and evaluate the RCA Advisor's compensation; (iv) provided that the RCA Advisor has a fiduciary duty to RCA and its stockholders; (v) provided that the RCA Advisor had "a fiduciary responsibility and duty to the Company and to the Stockholders;" and

(v) empowered a majority of the independent directors to terminate the Advisory Agreement on sixty (60) days' written notice without cause or penalty.

50.    Defendants also sought to eliminate Section 6.5 of the Charter, that provides that the Company's directors serve in a fiduciary capacity to the Company and that the directors also have a fiduciary duty to the stockholders, including a specific fiduciary duty to supervise the relationship of the Company with the RCA Advisor.

51.    Article XIV of RCA's Charter titled "ROLL-UP Transactions" was another Charter provision that Defendants sought to eliminate.  Article XIV provided, among other things that prior to conducting a roll-up transaction, RCA would be required to obtain an appraisal of the Company's assets. In addition, as part of the roll-up transaction, RCA and the Director Defendants would be required to provide stockholders certain rights including the right to remain as a stockholder of the Company and preserve their interests therein on the same terms and conditions as existed previously, or to receive cash in an amount equal to the stockholders pro rata share of the appraised value of the net assets of the Company, even if the Board of Directors concludes that transaction would be in the Company's best interests.

52.    Article X, another provision of the Charter that Defendants sought to eliminate, provided in Section 10.3 that:

> The Company shall not engage in any other transaction with the Sponsor, a Director, the Advisor or any Affiliates thereof unless a majority of the Directors (including a majority of the Independent Directors) *not otherwise interested in such transaction* approve such transaction as fair and reasonable to the Company and *on terms and conditions not less favorable to the Company than those available from unaffiliated third parties*." (Emphasis added).

53.    On August 16, 2016, RCA disclosed in a Form 8-K filed with the SEC that it had failed to obtain the necessary shareholder vote to amend the Charter in order to eliminate the protections afforded RCA shareholders.   This was not for the lack of trying as the RCA Board

had adjourned the shareholder meeting originally scheduled for June 29, 2016 in order to allow more time to solicit proxies in favor of the Charter amendments.

**Defendants Announce the Merger Following Their**
**Failure to Gain Approval of the Charter Amendments**

54. On September 7, 2016, RCA issued a press release announcing that the Committee had approved a definitive merger agreement (the "Merger Agreement") with AFIN for a transaction valued at approximately $1.4 billion, payable in a combination of AFIN common shares and cash plus the assumption of certain debt. The total consideration per share of RCA was reported to be $10.26, based on AFIN's published estimated per share NAV as of December 31, 2015 of $24.17.

55. The Merger Agreement also provided, among other things, that:

(a) the Merger was conditioned upon RCA obtaining stockholder approval of Charter amendments designed to eliminate the protections afforded to stockholders by Article XIV of the Charter including the ability to receive payment based upon an appraisal of their shares (Merger Agreement §6.1(a)), and the right to have the Company's assets appraised;

(b) the Advisory Agreement was extended to a twenty-year agreement, without the need the annual approval of its agreement by its independent directors, and eliminating reference to its fiduciary duties to both the Company and stockholders (Merger Agreement at 2);

(c) RCA paying a termination fee of approximately $25.6 million to AFIN in the event that RCA failed to complete the Merger, or $5 million if it is unable to obtain stockholder approval (Merger Agreement §7.4);

(d)  AFIN's board of directors would be expanded from 4 to 6 members

(Merger Agreement §1.6); and

(e)  That the Merger would be completed by March 6, 2017. (Merger

Agreement §7.1).

**The Committee's Negotiation of the Merger Did Not Reflect Either Good Faith or the Care That an Ordinarily Prudent Person Would Use Under Similar Circumstances**

56.    The Merger Agreement is the outcome of flawed process in which the conflicted Special Committee negotiated the terms of the Merger Agreement by retaining BMO to provide financial advice and assistance.  BMO, however, suffered from clear conflicts based upon an existing and extensive financial relationship with AR Global and its affiliates including acting as a financial adviser in other merger transactions involving AR Global controlled entities and as a lender to AR Global entities through its banking division, and this could not in good faith be relied upon.

57.    For example, BMO acted as a lender to HTI, another AR Global controlled entity, providing it with a credit facility equal to $125 million, and as a purported independent financial advisor to the "special committee" of American Realty Capital Global Trust II, Inc., in connection with its merger with related Global Net Lease, Inc., entities related to AR Global, RCA and AFIN.

58.    BMO's lack of independence was compounded by the structure of BMO's compensation that was heavily weighted towards successful completion of the Merger. Specifically, RCA paid BMO $5.9 million, $1.0 million of which was payable upon delivery of an opinion and an additional $4.9 million payable upon the closing of the Merger.

59.    In retaining BMO, the Special Committee failed to consult with Lincoln even though Lincoln was the entity most familiar with the value of the Company's properties through

its direct involvement in both selecting the properties acquired by RCA and in managing those properties.  The January 3, 2017 edition of *The Stanger Report* entitled "Bottom of the Ninth – RCA Investors At Bat: Will AFIN and ARC Global 'Pitch' the Perfect Game," stated that "the firm [*i.e.*, Lincoln] which assembled the RCA portfolio and conducted asset and property management and leasing services, apparently is being left in the dugout during the entire game." Specifically, "the firm most familiar with the RCA portfolio apparently is not consulted during negotiations on the transaction" including "the pricing of the merger."

60.     The Special Committee assumed a value of $24.17 for each share of AFIN based upon an estimate of NAV prepared by Duff & Phelps ("D&P") as of December 31, 2015 when negotiating the Merger consideration.  However, that value was inflated even based upon the analysis performed by BMO which indicated a lower NAV of between $20.65 and $23.37.  *See* Proxy at 128.

61.     The Special Committee also failed to obtain an analysis of alternate values that RCA shareholders could obtain through strategic alternatives to the Merger, including an orderly liquidation value of the Company's assets even though the Charter – in a provision Defendants unsuccessfully sought to eliminate through the April 2016 Proxy – provided for disclosure of that information to RCA's shareholders.  In addition, BMO valued RCA based on an assumption that the Company's value would be reduced by the obligation to pay a 3.0% management fee even though such fees would not have to be paid if RCA engaged in an orderly liquidation of its real estate portfolio or simply elected not to renew its management contract with the RCA Advisor. Furthermore, the Special Committee capitulated on every key item relevant to the Advisory Agreement.

62.     The Special Committee also spent months negotiating exclusively with AFIN

even though there was no indication that AFIN would have withdrawn its offer to acquire RCA

had the Company solicited competing bids and every indication that it was part of AR Global's

overarching roll up plan, such that it would not have walked away from the transaction.  The go

shop exercise purportedly permitted after the signing of the Merger Agreement was also

inadequate because: (a) it was premised upon a competing bidder exceeding a fictitious Merger

consideration value based upon the $24.17 NAV assigned to AFIN stock as well as the

termination fees which were part of the Merger Agreement; (b) any competing bidder needing to

negotiate with AR Global which was institutionally opposed to any competing bid; and (c) the

45-day period for the go shop was exceedingly short given the need for any potential acquirer to

conduct financial due diligence as well as physical due diligence of the 35 properties owned by

RCA while lining up the necessary financing to acquire the Company.

**Defendants Seek to Obtain Shareholder Approval of the**
**Merger by Disseminating a Materially False or Misleading Proxy**

63.     On or about December 16, 2016, Defendants disseminated the Proxy to Plaintiffs

and other RCA shareholders in an effort to obtain approval of proposals to: (a) amend the

Charter to delete the Article XIV provisions relating to Roll-Up Transactions; (b) approve the

Merger Agreement; and (c) allow the adjournment of the stockholders' meeting to allow for

additional solicitation of stockholder votes.

64.     The Proxy attaches great weight to AFIN's published estimated per share NAV of

$24.17 per share as of December 31, 2015.  That estimated NAV was used to calculate the

Merger consideration of $10.26 per RCA share as a one of the "RCA Board's Reasons for the

Merger."  Proxy 2.  Specifically, utilizing that value provides "a premium to shareholders of

RCA compared to the initial public offering price for RCA's shares of $10.00 per share."  *Id.*

*See also* Proxy at 110.  The $24.17 value is repeated throughout the Proxy on numerous occasions.  *See e.g.* Proxy at 1, 2, 3, 9, 15, 21, 110, 131, A-4.

65.     The Proxy's repeated reference to AFIN's published estimate of its NAV was materially false or misleading because the $24.17 NAV was stale and no longer represented an accurate statement of AFIN's estimate of its NAV at the time of the Proxy.  Indeed, on March 20, 2017, after the Merger was finalized, AFIN in a Form 8-K filed with the SEC finally disclosed that its NAV as of December 31, 2016 was $23.37 per share.  Moreover, even $23.27 represents an inflated value as it includes without any meaningful explanation "the Estimated Per-Share increase from the Merger"; that is, the estimated NAV would have been lower than $23.37 per share had the Merger not taken place.

66.     In addition, the $24.17 NAV was materially misleading because it was based on a capitalization rate of approximately 6.09% that was utilized in its calculation, which was far below the 8.6% capitalization rate for the sale of three properties that were rented to Merrill Lynch, Pierce, Fenner & Smith (the "Merrill Lynch Properties").  This 8.6% capitalization rate was also greater than the 6.5% to 7.0% capitalization rate applied by BMO (*see* Proxy at 127).  Applying that 8.6% capitalization rate to the remaining properties owned would have resulted in a material decline in AFIN's reported and estimated NAV.

67.     The sale of the Merrill Lynch Properties for $148 million (which AFIN purchased for $165,436,000) reflected a loss of nearly $17.5 million, a decrease of 10.5%.  The sale of the Merrill Lynch Properties at a price below cost basis (consisting of the original purchase price plus post-acquisition capital expenditures) was inconsistent with the assumption underlying the reported $24.17 NAV that there had been an overall 14.5% increase from that cost basis.  AFIN reported in its 1Q 2017 Form 10-Q that it sold the Merrill Lynch Properties "for a contract price

of $145.5 million, net of closing costs. These properties had a net carrying value at the date of

disposition of $140.3 million, resulting in a gain on sale of $5.2 million." Even a $5.2 million

gain on a $140.3 million property equals a gain of only 3.7%, far less than 14.5%.

68.     These same infirmities plague the $23.37 NAV, strongly suggesting that AFIN's

true NAV was at most $20.79 per share, representing the lower end of the D&P estimated

valuation, a value that is also inflated to take in to account an unknown amount related to "the

Estimated Per-Share increase from the Merger."  Furthermore, D&P did not include enterprise-

wide values in its analysis, such as the onerous terms of the AFIN's management contract, which

would have reduced the value of AFIN's stock.

69.     The Proxy also failed to disclose that the timing of the March 6, 2017 deadline to

consummate the Merger (Proxy at 17) allowed AFIN to avoid disclosing an updated NAV.  That

NAV would have been even materially lower than the $23.37 NAV disclosed in March 2017

which, as alleged above, was inflated due to, among other things, including the expected benefits

of the Merger in calculating the NAV.

70.     The Proxy also sought to portray AFIN as a company with solid growth prospects.

A summary of the AFIN Standalone Projections estimates that: Cash Net Operating Income

("NOI") would increase by approximately 21.5% from $160.9 million in 2016 to $195.6 million

in 2017; Funds From Operations would increase by more than 62% from $62.3 million in 2016

to $101.2 million in 2017; and Modified Funds From Operations ("MFFO") would increase by

more than 38% from $73.8 million in 2016 to $102.2 million in 2017.  *See* Proxy at 122.

However, those projections of material growth in NOI, FFO and MFFO were materially false or

misleading because they failed to disclose that:

(a) The projected 2016 results represented a *decline* from AFIN's 2015 reported FFO of $80.4 million and MFFO of $82.7 million, representing a more than 22.5% decline in FFO and more than 10% decline in MFFO;

(b) AFIN's rental income had only grown by approximately 2% in 2016 from $160.9 million to $164.4 million;

(c) An impairment charge of $27.3 million taken by AFIN relating to 45 bank branches with respect to which SunTrust was declining to renew its leases would further impair AFIN's ability to grow its NOI, FFO and MFFO; and

(d) AFIN's failure to acquire any significant rental properties combined with its decision to sell properties located in New Jersey for $148 would further inhibit AFIN's ability to grow its NOI, FFO and MFFO in 2017.

71.     The Proxy disclosed that AFIN derived 17.8% of its consolidated annualized rental income from properties where SunTrust Bank was the tenant.  Proxy at 46.  However, the Proxy omitted the material fact that AFIN had incurred $27.3 million in impairment charges for the year ended December 31, 2016 related to those 45 bank branch properties that had been leased from AFIN by SunTrust.  AFIN finally disclosed the first installment of this impairment in its 2016 Form 10-K, which was filed with the SEC on March 13, 2017, less than a month *after* the Merger vote.  In addition, in AFIN's 1Q 2017 Form 10-Q, filed with the SEC on May 12, 2017, AFIN disclosed that it incurred $3.9 million of impairment charges for the three months ended March 31, 2017 stating that:

> $2.4 million of these impairment charges related to our properties reclassified as held for sale, as the carrying amount of the long-lived assets associated with these properties was greater than our estimate of their fair value less estimated costs to sell.  The remaining $1.5 million of impairment charges were taken on five held for use properties operated by SunTrust, which had lease terms set to expire between December 31, 2017 and March 31, 2018.

72.     The Proxy is also materially misleading in its description of BMO's analysis of AFIN's value.  Specifically, rather than rely on current data in order to value AFIN's real estate assets, BMO relied on the projections of AFIN's management.  However, to the extent BMO relied on the AFIN Standalone Projections contained in the Proxy, as alleged above (*see* ¶70, *supra*), those projection lacked a reasonable basis and omitted to state material facts necessary to make them not be misleading.  In the alternative, to the extent BMO relied on another set of AFIN management projections, the failure to disclose those projections and the assumptions underlying those projections made BMO's reported analysis so incomplete as to be materially misleading.

73.     The Proxy discloses that UBS derived a standalone discounted cash flow analysis ranging from $13.93 to $28.34 per share, with a midpoint of $19.82 for AFIN, utilizing discount rates ranging from 6.0% to 7.0%.  *See* Proxy at 119.  In contrast, BMO's standalone discounted cash flow analysis utilized discount rates ranging from 6.4% to 7.8% and arrived at a per share value for AFIN of between $18.34 and $21.68 (*see* Proxy at 128) with a midpoint of $20.01.  The Proxy, however, was materially false and misleading in failing to offer any explanation for how UBS and BMO derived such widely different discount rates and valuations for AFIN.

74.     The Proxy is also materially misleading in describing the "Background of the Merger" for at least the following reasons:

(a)     It attributes AFIN's failure to obtain a planned listing on the New York Stock Exchange ("NYSE") in the third quarter of 2015 "due to unfavorable market conditions."  Proxy at 93.  However, the Proxy fails to disclose the nature of those unfavorable market conditions, *i.e.*, whether they related to all REITs or just REITs under the control of AR Global, and whether or at what point in time those unfavorable market conditions are likely to abate.

This made it impossible for Plaintiffs and the other members of the Class to evaluate the likely future trading price of AFIN and therefore impossible to determine whether the Merger represented a superior alternative to liquidating the Company or simply not proceeding with the Merger;

(b)       It identifies RCA's non-management directors as being "independent" and then part of a "Special Committee" (*e.g.*, Proxy at 3) without disclosing that both defendants Rendell and Michelson earn hundreds of thousands of dollars in compensation (*see* ¶¶13-14, *supra*) annually from their directorships with various AR Global affiliated entities representing a material portion of their respective annual earnings and therefore are not independent;

(c)       Although disclosing other potential "Strategic Counterparties" who were involved with AFIN and RCA discussions, it fails to identify any of those strategic counterparties, any terms proposed with those Strategic Counterparties (Proxy at 93-99) or the reasons why they were not involved in any transactions with AFIN or RCA;

(d)       Although disclosing that BMO purportedly solicited interest from other buyers after the time RCA had already entered into a merger agreement with AFIN (Proxy at 106 ), it fails to disclose whether the terms upon which other potential acquirers were solicited provided for the continued involvement of AR Global receiving fees for the management of RCA's assets;

(e)       Although disclosing that the merger agreement contains a 45 day "go shop" provision, it fails to disclose that the go shop was hampered by AR Global's compromised integrity (*see* ¶¶28-35, *supra*) and the need of any competing bidder to top both a fictitious value based upon AFIN's $24.17 NAV and the related termination fees contained in the Merger Agreement.

(f)     The Proxy's discussion of the 45-day "go shop" provision was materially false or misleading because it failed to disclose that bidders for real estate properties do not rely on desktop analyses but rather conduct personal inspections of the subject properties making , the 45-day go shop period unrealistically short for a company holding 35 properties in 16 states.

**The Merger is Approved by RCA Shareholders By a
Razor-Thin Margin Following a  Hard Sell By Defendants**

75.   Defendants had difficulty obtaining the necessary votes to approve the Merger.  In order to obtain the necessary votes Defendants engaged in an aggresive telephone solicitation effort combined with meetings with financial advisors who could influence their clients to vote in favor of the Merger.  Those solicitations are reflected in twenty-seven (27) Forms 425 filed with the SEC purportedly reflecting the contents of those solicitations.  Plaintiffs and other RCA shareholders were subject to a barrage of phone calls urging them to vote in favor of the Merger and standing ready to accept a yes vote over the phone.

76.   On February 13, 2017, Defendants purportedly obtained approval of the Merger and the Charter amendment by bare majorities of the total number of outstanding shares of RCA stock--- respectively, approximately 50.21% and 50.02%.  Defendants took until late the next day to announce this very slim majority approval.  On February 16, 2017, the Merger was consummated.

**Disclosures Made by AFIN After the Merger Was Completed**

77.     On February 21, 2017, AFIN disclosed that Defendants Michelson and Rendell had joined AFIN's board of directors.

78.     On March 13, 2017, AFIN filed its 2016 Form 10-K with the SEC disclosing, among other things that, AFIN had taken a $27.3 million charge taken with respect to the SunTrust properties.

79.     On March 20, 2017, AFIN filed an 8-K with the SEC disclosing a new NAV of

$23.37 as of December 31, 2016 but also taking into account the increase in value resulting from

the Merger without disclosing the amount of that increase in value attributable to the successful

closing of the Merger.

80.     On May 12, 2017, AFIN filed its 1Q 2017 Form 10-Q with the SEC disclosing

that its rental income (excluding income on properties acquired in the Merger) had decreased by

$1.5 million from $40.5 million to $39 million or 3.7% from the same quarter the year before on

the properties owned by AFIN.  The Form 10-Q also disclosed that AFIN had taken additional

impairment charges of $3.9 million for the three months ended March 31, 2017 of which $2.5

million related to the SunTrust properties.

81.     On June 14, 2017, AFIN filed a Form 8-K with the SEC disclosing that: (a) AFIN

was limiting the availability of its share repurchase program to shareholders that had died or had

a qualifying disability; and (2) AFIN was decreasing its dividend from $1.65 per share to $1.30

per share on an annualized basis, reducing the annual distribution per pre-Merger RCA share

from $0.64 to $0.50, or by more than 20%.

## CLASS ACTION ALLEGATIONS

82.     Plaintiffs bring this action on behalf of a class (the "Class") pursuant to Federal

Rules of Civil Procedure 23(a), (b)(2) and (b)(3), on behalf of all shareholders of RCA common

stock who were eligible to vote with respect to the Proxy and received AFIN stock in the Merger.

Excluded from the Class are Defendants, and to the extent that they are individuals, their

immediate family members, affiliates, heirs, assigns, and agents, and officers of RCA, AFIN and

AR Global; with respect to RCA, its parent companies and subsidiaries, and any related or

affiliated person, firm, trust, corporation, or other entity.  This action is properly maintainable as

a class action for the following reasons:

(a)     The Class is so numerous that joinder of all members is impracticable.  As of December 15, 2016, the Company had over 99 million shares of stock outstanding, likely held by hundreds, if not thousands, of beneficial owners.

(b)     There are questions of law and fact that are common to the Class and that predominate over questions affecting any individual Class member.  The common questions include, *inter alia*, the following:

i.     whether the disclosures contained in the Proxy violated Section 14(a) of the Exchange Act and SEC Rule 14a-9;

ii.     whether the Merger was subject to Section 13(e)(3) of the Exchange Act and RCA and AFIN failed to make all the disclosures required by Schedule 13e-3 with respect to the Merger;

iii.     whether Director Defendants and AR Global are secondarily liable under Section 20(a) of the Exchange Act for RCA's primary violations of Sections 13(e) and 14(a) of the Exchange Act;

iv.     whether the disclosures in the registration statement of which the Prospectus is part violated Section 11 of the Securities Act by containing an untrue statement of material fact or omitting to state a material fact required to be stated therein or necessary to make the statements therein not misleading;

v.     whether the disclosures in the Prospectus violate Section 12(a)(2) of the Securities Act by including any untrue statements of material fact in the Prospectus or omitting to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not materially misleading;

vi.      whether AFIN and Weil are statutory sellers within the meaning of Section 12(a)(2);;

vii.      whether AR Global is secondarily liable under Section 15 of the Securities Act for AFIN's violations of Sections 11 and 12(a)(2) of the Securities Act ;

viii.      whether RCA and AFIN are liable for violations of Section 13(e) of the Securities Exchange Act and SEC Rule 13e-3;

ix.      whether the Director Defendants breached their duties to the Class;

x.      whether the Director Defendants breached the terms of the Charter; and

xi.      whether AR Global and the RCA Advisor were unjustly enriched as a result of the Merger.

83.      Plaintiffs' claims are typical of the claims of the other members of the Class in that all members of the Class will be damaged alike by the wrongs complained of herein.

84.      This class action is a fair and efficient method of adjudicating the claims of Plaintiffs and the other Class members for the following reasons:

(a) common questions of law and fact predominate over any question affecting any individual Class member;

(b) the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, thereby establishing incompatible standards of conduct for Defendants or would allow the claims of some members of the Class to adversely affect other Class members' ability to protect their interests, or adjudications with respect to individual members of the Class which would as a

practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests;

(c) Plaintiffs anticipate no difficulty in the management of this action as a class action; and

(d) the Class members are readily definable, and prosecution as a class action will eliminate the possibility of repetitious litigation, while also providing redress for claims that may be too small to support the expense of individual, complex litigation.

85.     Plaintiffs are committed to prosecuting this action and have retained competent counsel experienced in litigation of this nature.  Plaintiffs are adequate representatives of the Class.

86.     Defendants have acted and will continue to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Class as a whole.

87.     For these reasons, a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

<u>**COUNT I**</u>

<u>**EXCHANGE ACT SECTION 14(a) AND SEC RULE 14a-9**</u>

88.     Plaintiffs repeat and reallege all the allegations contained in the preceding paragraphs as if fully set forth herein.

89.     This Count arises under Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a) and Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated thereunder by the SEC against RCA and Defendants Weil, Michelson and Rendell (the "Director Defendants").  This Count is not alleging fraud, intentional conduct or recklessness.

90.    The contents and the distribution of the Proxy were approved by the Board and thus by each Director Defendant.

91.    Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a), provides that "[i]t shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. §78l]."

92.    SEC Rule 14a-9, promulgated pursuant to Section 14(a), prohibits the issuance of any proxy statement "which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy or the same meeting or subject matter which has become false or misleading."  17 C.F.R. §240.14a-9(a).

93.    RCA and the Director Defendants issued and disseminated the false and misleading Proxy that failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, and/or omits material information.  The Defendants named in this Count solicited Plaintiffs and the Class to vote on the Merger and Charter Amendment through the Proxy.  A stockholder vote was required to approve the Merger and the other proposals contained in the Proxy which were an essential causal link to the consummation of the Merger.

94.     As a result of the Proxy containing material misrepresentations and/or omissions, Lead Plaintiff and the other members of the Class have suffered and will suffer substantial harm.

95.     The facts misrepresented and/or omitted in the Proxy are material because under all the circumstances there is a substantial likelihood that a reasonable stockholder considered these false and misleading statements of fact or omitted facts important in deciding how to vote on the Merger and other proposals contained in the Proxy and considered these facts a material part of the mix of information available to Plaintiffs and the Class in deciding how to vote.

96.     As a direct and proximate result of the issuing of the false and materially misleading Proxy by the Company and the Director Defendants,  Plaintiffs and other members of the Class have suffered damages in connection with the proposals being made in the Proxy relating to approving the Merger.

97.     By reason of the misconduct alleged herein, the Company and the Director Defendants are liable to Plaintiffs and other members of the Class pursuant to §14(a) of the Exchange Act and Rule 14a-9.

## COUNT II

## SECTION 13(e) OF THE EXCHANGE ACT AND SEC RULE 13e-3

98.     Plaintiffs repeat and reallege each allegation contained above as though fully set forth herein.

99.     This Count arises under Section 13(e) of the Exchange Act, 15 U.S.C. §78m(e) and Rule 13e-3 promulgated thereunder by the SEC, 17 C.F.R. §240.13e-3, against RCA and AFIN. This Count is not alleging fraud, intentional conduct or recklessness.

100.    AFIN is an issuer having a class of equity securities that are registered with the SEC pursuant to Section 12 of the Exchange Act, 15 U.S.C. §78k, which are not listed on a

national securities exchange or authorized to be quoted in an inter-dealer quotation system of a registered national securities association.

101.    RCA and AFIN, at the times relevant to this action, were under the common control of AR Global causing RCA to be an affiliate of AFIN.

102.    The Proxy and other communications directed at Plaintiffs and members of the Class were solicitations subject to Regulation 14A issued in connection with a merger, consolidation or similar transactions between AFIN or its subsidiaries and RCA, an affiliate of AFIN.

103.    Plaintiffs and other members of the Class were unaffiliated security holders of RCA.

104.    AFIN directly or indirectly made untrue statements of material fact or omitted to state material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

105.    The reports issued by D&P with respect to AFIN's NAV and RCA's NAV (the "D&P Reports") were materially related to the terms upon which the Merger was being proposed and, as a result, Rule 13e-3 required AFIN and RCA to make the D&P Reports available for inspection and copying by any interested shareholder of the Company.  *See* 17 C.F.R. §229.1015(c).  Nonetheless, the Proxy fails to contain any such statement that the D&P Reports were available for inspection and copying to Plaintiffs and the Class.

106.    BMO's analysis of the value of RCA was materially related to the terms upon which the Merger was being proposed and, as a result, Rule 13e-3 required that AFIN and RCA make the D&P Reports available for inspection and copying by any interested shareholder of the Company.  *See* 17 C.F.R. §229.1015(c).  Nonetheless, the Proxy fails to contain any such

statement that the D&P Reports were available for inspection and copying to Plaintiffs and the Class.

107.    BMO's report was materially related to the terms upon which the Merger was being proposed, and, as a result, Rule 13e-3 required that AFIN and RCA make the BMO report available for inspection and copying by any interested shareholder of the Company.  *See* 17 C.F.R. §229.1015(c).  The Proxy states that in conjunction with rendering its report, BMO relied upon the "RCA Projection Model" as prepared by RCA management (Proxy at123) and the "AFIN Projection Model" as prepared by AFIN management (Proxy at 124) yet the Proxy fails to contain any such statement that those projection models were available for inspection and copying to Plaintiffs and the Class and fails to disclose them.

108.    AFIN and RCA failed to comply with the requirements of Rule 13e-3 by, among other things, failing to include a reasonably detailed discussion as to whether the compensation being received by Plaintiffs and other unaffiliated shareholders in the Merger was fair in relationship to RCA's liquidation value and going concern value.

109.    As a direct and proximate result of the violations alleged in this Count, Plaintiffs and other members of the Class have suffered damages in connection with the proposals being made in the Proxy relating to approving the Merger.

## COUNT III

## SECTION 20(a) OF THE EXCHANGE ACT

110.    Plaintiffs repeat and reallege all the allegations contained in the preceding paragraphs as if fully set forth herein.

111.    This Count is brought pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a), against the Director Defendants and AR Global.  This Count is not alleging fraud or intentional conduct or recklessness.

112.    The Director Defendants and AR Global acted as controlling persons of RCA within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false and misleading Proxy filed by the Company with the SEC and disseminated to the investing public, the Director Defendants and AR Global had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of various statements in the Proxy which Plaintiff alleges are false and misleading.

113.    The Director Defendants and AR Global were provided with or had access to copies of the Proxy alleged by Plaintiffs to be false and/or misleading prior to and/or shortly after it was issued and had the ability to prevent the issuance of the false and/or misleading statements therein or cause the statements to be corrected.

114.    In particular, each of the Director Defendants and AR Global had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercise the same.

115.    As alleged above in Counts I and II, the Company violated Sections 13(e) and 14(a) of the Exchange Act by their acts and omissions as alleged in this Complaint.  By virtue of

their positions as controlling persons, the Director Defendants and AR Global are liable pursuant to Section 20(a) of the Exchange Act.

## COUNT IV

## SECTION 11 OF THE SECURITIES ACT

116.    Plaintiffs repeat and reallege each and every allegation contained above.

117.    This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Plaintiffs and the other members of the Class, against AFIN and Defendants Weil, Radesca, Gong, Perla and Kabnick.  This Count is not alleging fraud or intentional conduct or recklessness.

118.    The Prospectus was filed with the SEC as part of an S-4 registration statement (the "Registration Statement").

119.    Plaintiffs and the other members of the Class acquired common stock of AFIN issued pursuant to the Registration Statement.

120.    The Registration Statement and the Prospectus incorporated therein were contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

121.    AFIN is the registrant for the stock offered in the Registration Statement.  As issuer of the common stock, AFIN is strictly liable to Plaintiffs and the Class for the misstatements and omissions.

122.    Defendants Weil, Radesca, Gong, Perla and Kabnick each signed the Registration Statement individually or through an attorney-in-fact and, therefore, are liable pursuant to Section 11(a)(1) of the Securities Act for any material misstatements of fact or failure to disclose facts necessary to make the statements made in the Registration Statement and the Prospectus not materially misleading.

123.    Defendants Weil, Gong, Perla and Kabnick are each a director of AFIN and, therefore, are liable pursuant to Section 11(a)(2) of the Securities Act for any material misstatements of fact or failure to disclose facts necessary to make the statements made in the Registration Statement and the Prospectus not materially misleading.

124.    In connection with the offering and sale of AFIN common stock, the Defendants named in this Count used the means and instrumentalities of interstate commerce and the United States mails.

125.    Defendants Weil, Radesca, Gong, Perla and Kabnick failed to make a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement and Prospectus were true and without omissions of any material facts necessary to make such statements not misleading..

126.    By reasons of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated, Section 11 of the Securities Act.

127.    By virtue of these violations, Plaintiffs and the other members of the Class have sustained damages.

128.    Less than one year has elapsed from the time that Plaintiffs discovered the facts upon which this complaint is based to the time that Plaintiffs filed the initial Complaint.  Less than three years elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Plaintiffs filed this Complaint.

## COUNT V

## SECTION 12(a)(2) OF THE SECURITIES ACT

129.    Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

130.     This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2), on behalf of the Class against defendants AFIN and Weil. This Count is not alleging fraud or intentional conduct or recklessness.

131.     AFIN and Weil solicited the sale of AFIN common stock for their own benefit pursuant to the Prospectus.

132.     Plaintiffs and the other members of the Class purchased or otherwise acquired shares of AFIN common stock pursuant to the Prospectus.

133.     As alleged above, the Prospectus contained untrue statements of material fact, omitted to state other facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein.  AFIN and Weil's solicitation included preparing the inaccurate and misleading Prospectus and participating in efforts to gain approval of the Merger such that AFIN common stock could be issued in exchange for the shares of the Company's common stock.

134.     AFIN and Weil owed to the purchasers of AFIN common stock, including Plaintiffs and the other Class members, the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus and related documents to ensure that such statements were accurate and that they did not contain any misstatement or omission of material fact.  Defendants AFIN and Weil, in the exercise of reasonable care, should have known that the Prospectus and related documents contained misstatements and omissions of material fact. Defendants did not make a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Prospectus were true and without omissions of any material facts necessary to make such statements not misleading.

135.     Plaintiffs and the other members of the Class purchased or otherwise acquired AFIN common stock pursuant to the Prospectus, and neither Plaintiffs nor the other Class members knew, or in the exercise of reasonable diligence could have known, of the untruths, inaccuracies and omissions contained in the Prospectus.

136.     By reasons of the conduct herein alleged, each Defendant named in this Count violated Section 12(a)(2) of the Securities Act.

137.     By virtue of these violations, Plaintiffs and the other members of the Class have sustained damages.  Accordingly, Plaintiffs and the other members of the Class who purchased or otherwise acquired AFIN common stock pursuant to the Prospectus have a right to rescind and receive their consideration paid, and hereby elect to rescind and tender their AFIN common stock to AFIN and Weil.  Members of the Class who have sold their AFIN common stock issued in connection with the Merger are entitled to compensatory damages.

138.     Less than one year has elapsed from the time that Plaintiffs discovered the facts upon which this complaint is based to the time that Plaintiffs filed the initial Complaint.  Less than three years elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Plaintiffs filed this Complaint.

## COUNT VI

## FOR VIOLATIONS OF SECTION 15 OF THE SECURITIES ACT

139.     Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

140.     This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. §77o, against the AR Global on behalf of Plaintiffs and the other members of the Class. This Count is not alleging fraud or intentional conduct or recklessness.

141.    AR Global was a control person of RCA and AFIN.  AR Global participated in the operation and management of AFIN, and also participated in the Merger.  AR Global was a controlling person of AFIN, and had the power and influence to cause (and did cause) RCA and AFIN to engage in the conduct complained of herein, including disseminating the Registration Statement and the Prospectus , which were materially false and misleading.

142.    AR Global was a culpable participant in the violations of Sections 11 and 12(a)(2) of the Securities Act alleged in Counts IV and V above by having otherwise participated in the process through which the Merger was consummated, the Registration Statement and Prospectus were prepared, filed with the SEC and disseminated to RCA shareholders.  By reason of the foregoing, AR Global is liable under Section 15 of the Securities Act to the same extent that AFIN is liable under Sections 11 and 12(a)(2) of the Securities Act to Plaintiffs and the other members of the Class who purchased AFIN common stock issued pursuant to or traceable to the Joint Proxy Statement/Prospectus.  By reason of such wrongful conduct, Plaintiffs and the Class suffered damages for which these Defendants are liable.

## COUNT VII

## BREACH OF DUTIES

143.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above as if set forth fully herein.

144.    This Count is alleged against the Director Defendants for breach of duties.

145.    The Director Defendants were contractually obligated under the terms of the Charter to act as fiduciaries with respect to RCA and its shareholders and under Maryland law.

146.    The Director Defendants are all directors of the Company and, in that capacity, owed duties to act in good faith, in a manner each director reasonably believes to be in the best

interests of the corporation for which he serves, and with the care that an ordinarily prudent person in a like position would use under similar circumstances.

147.    The Director Defendants breached these duties as set forth in Section 2-405.1, and are not entitled to the business judgment presumption as they are not disinterested,  they acted in bad faith, without due care and in a manner that was not reasonable including, *inter alia*, favoring the interests the interests of AR Global and its affiliates, including AFIN, to the detriment of the Company and its minority stockholders and failing to comply with the terms of the Company's Charter, acting in furtherance of their own personal, pecuniary interests, and failing to act with due care and with sufficient information to determine whether the Merger rather than an orderly liquidation of the Company, among other alternatives, constituted a fair and reasonable method for liquidating the Company.

148.    As a direct and proximate result of these breaches, the Class has been damaged.

## COUNT VIII

## BREACH OF CONTRACT

149.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above as if set forth fully herein.

150.    This Count is alleged against the Director Defendants for breach of contract.

151.    A corporate charter is a contract among the company, which acts through its board of directors, and the company's shareholders.  Because the company acts through its board of directors, the board is charged with the duty of keeping the company in compliance with the charter and to prevent it from breaching that contract.

152.    The Defendants named in this Count failed to comply with the terms of the Charter by, among other things: (a) failing to act properly as fiduciaries in the context of

negotiating the Merger, approving the Merger and in making disclosures to Plaintiffs and other

Class members in connection with soliciting their approval of the Merger; (b)  failing to comply

with Section 6.5 of the Charter; (c) failing to comply with Section 10.3 of the Charter; by, among

other things, failing to properly insure that the Merger's terms were at least as favorable to

RCA's shareholders as those available from   unaffiliated third parties; (d) failing to insure that

there independent directors within the meaning of the Charter who could review and approve the

terms of the Merger; and (e) failing to provide Plaintiffs and other Class members with

information from a qualified appraiser concerning the amount which RCA could be expected to

realize from an orderly liquidation of the properties it owned.

153.    As a direct and proximate result of these breaches, the Class has been damaged.

## COUNT IX

## UNJUST ENRICHMENT

154.    Plaintiffs incorporate by reference and reallege each and every allegation set forth

above as if set forth fully herein.

155.    This Count is alleged against AR Global and the RCA Advisor for unjust

enrichment.

156.    The Merger conferred a benefit on AR Global by means of its affiliate, AFIN,

acquiring the assets of RCA an unfair price and locking in RCA's assets into AR Global

management (and fees) for the next twenty years.  AR Global is continuously receiving the

benefits of these management fees.  AR Global had knowledge of this benefit as it controlled

both RCA and AFIN and Defendant Weil is the CEO of AR Global and AFIN and was the CEO

of RCA.

157.    It would be unconscionable and contrary to fundamental principles of justice, equity and good conscience for AR Global to be permitted to retain this substantial and undue economic benefit.

158.    The Merger conferred a benefit on the RCA Advisor by means of American Realty Capital Retail Special Limited Partnership, LLC's (the RCA Advisor's direct owner) interest in the OP being redeemed for a cash payment to the RCA Advisor.  The amount of this payment was determined in accordance with the existing terms of the OP's agreement of limited partnership.  Integral in determining the amount of the case payment was the per share value of AFIN's common stock, which was valued by AFIN to be $24.17.  The RCA Advisor had knowledge of this benefit as it is ultimately controlled by AR Global.

159.    It would be unconscionable and contrary to fundamental principles of justice, equity and good conscience for the RCA Advisor to be permitted to retain this substantial and undue economic benefit.

160.    As a direct and proximate result of these breaches, the Class has been damaged.

**WHEREFORE,** Plaintiffs demand judgment as follows:

A.    Declaring this Action to be a proper class action and naming Plaintiffs as Class representatives;

B.    Rescinding the sale of AFIN stock or, in the alternative, awarding rescissory damages;

C.    Awarding damages on Count IV in accordance with Section 11(e) of the Securities Act;

D.      Ordering Defendants to pay to Plaintiffs and to other members of the Class all damages suffered and to be suffered by them as the result of the acts and transactions alleged herein;

E.      Awarding Plaintiffs the costs and disbursements of this action, including allowances for Plaintiffs' reasonable attorneys' and experts' fees; and

F.      Granting such other and further relief as may be just and proper.

**<u>JURY TRIAL DEMANDED</u>**

Plaintiffs hereby demand a trial by jury on all such issues so triable.

Dated: June 19, 2017

**ABRAHAM, FRUCHTER & TWERSKY, LLP**

/s/Jeffrey S. Abraham
Jeffrey S. Abraham, *pro hac vice*
jabraham@aftlaw.com
One Pennsylvania Plaza
Suite 2805
New York, NY 10119
Tel. (212) 279-5050
Fax (212) 279-3655

*Lead Counsel*

**TYDINGS & ROSENBERG LLP**
John B. Isbister, Federal Bar No. 00639
jisbister@tydingslaw.com
Daniel S. Katz, Federal Bar No. 01148
dkatz@tydingslaw.com
100 East Pratt Street, 26th Floor
Baltimore, MD  21202
Tel. (410) 752-9700
Fax (410) 727-5460

*Liaison Counsel*

**THEGRANTLAWFIRM, PLLC**
Lynda J.  Grant
521 Fifth Avenue, 17th Floor

New York, NY 10175
Telephone: (212) 292-4441
Facsimile: (212) 292-4442
lgrant@grantfirm.com

*Counsel for Plaintiffs Plaintiffs Paradise Wire & Cable
Defined Benefit Pension Plan, Hollingsworth,
Mendenhall and McFadden LLC, IG Holdings, Inc.,
and IG Revocable Trust*

**WOLF HALDENSTEIN ADLER FREEMAN &
HERZ LLP**
Lawrence P. Kolker
kolker@whafh.com
Matthew M. Guiney
guiney@whafh.com
270 Madison Avenue
New York, NY 10016
Tel. (212) 545-4600
Fax (212) 686-0114

*Counsel for Plaintiff Rene DeMeule*