IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

PARADISE WIRE & CABLE DEFINED
BENEFIT PENSION PLAN, *et al.*      *

v.                                   *       Civil Action No. CCB-17-132

EDWARD M. WEIL, JR., *et al.*        *

                                     *
                                    ***

**Memorandum**

The plaintiffs, a putative class led by Stuart Wollman, have sued four entities and seven individuals—AR Global Investments, LLC ("AR Global"); American Finance Trust, Inc. ("AFIN"); American Realty Capital – Retail Centers of America, Inc. ("RCA"); American Capital Retail Advisor, LLC; RCA Directors Leslie Michelson, Edward Rendell, and Edward M. Weil; Nicholas Redesca, Chief Financial Officer of AFIN; and David Gong, Stanley R. Perla, and Lisa D. Kabnick, directors of AFIN—claiming one or more of them violated provisions of the Securities and Exchange Acts, breached duties of care and loyalty, breached their contractual duties, and were unjustly enriched during a merger between RCA and AFIN. For the reasons stated below, the defendants' motions to dismiss will be granted.

**Background**

Though this case arises out of a merger between RCA and AFIN, two non-publicly traded real estate investment trusts ("REITs"), events leading to the filing of this complaint began with AR Global, an asset manager that controls and manages several REITs, including RCA and AFIN, and several advisory companies, including RCA Advisor. (Am. Compl. ¶¶ 1, 10-11). The amended complaint alleges that AR Global's business was disrupted by the disclosure of fraud at

1

two of its subsidiaries, causing some affiliated REITs to sever ties with AR Global subsidiaries. (*Id.* at ¶¶ 29-32). To limit the fallout from the adverse publicity, and to prevent other subsidiaries from terminating their advisory agreements, AR Global initiated a plan to merge or "roll-up" REITs bound to AR Global by weak contractual agreements with affiliates subject to more durable contracts. (*Id.* at ¶ 33). The merger between RCA and AFIN was part of this plan.

In February 2016, AFIN sent RCA a letter expressing interest in combining their businesses. (*Id.* at ¶ 36). To consider AFIN's proposal, RCA created a special committee comprised of independent directors Leslie Michelson and former Governor Edward Rendell, who then hired BMO Capital Markets, Inc. to advise them on the possible merger. (*Id.* at ¶ 37). The complaint alleges that BMO had a preexisting financial relationship with AR Capital while it was advising RCA, and that the agreement between the special committee and BMO incentivized BMO to favor the merger by offering an addition $4.9 million in fees if the merger closed. (*Id.*).

After negotiation, the parties agreed to the following merger terms: "per share consideration to RCA shareholders of 0.385 shares of AFIN common stock and $0.95 in cash," 45 days for RCA to shop for better deals, a clause that allowed RCA to accept a more favorable proposal, and a "two-tiered termination fee of 0.5% and 2.5% of the equity value of the transaction," the lower fee available if RCA terminated for a superior proposal. (*Id.* at ¶¶ 38-44). Notably, the special committee did not market check the consideration for the merger because it thought, based on market conditions, AFIN's offer would be the best it would receive. (*Id.* at ¶ 42).

The merger was yet threatened, despite promising negotiations, by provisions of RCA's charter that disfavored advisory agreements, imposed a fiduciary duty on the RCA directors, provided stockholders certain rights in a merger, and prevented RCA from agreeing to

transactions with affiliates (1) without a majority vote of disinterested directors and (2) if more favorable offers were made by unaffiliated third parties. (*Id.* at ¶¶ 49-52). RCA issued a proxy in April 2016 to eliminate these provisions. (*Id.* at ¶ 48). It failed. (*Id.* at ¶ 53).

RCA nevertheless announced, in September 2016, that it had reached a merger agreement with AFIN for $10.26 of total consideration per RCA share based on AFIN's estimated per share net asset value ("NAV"), calculated in December 2015. (*Id.* at ¶ 54). The agreement was conditioned on RCA receiving stockholder approval for the charter amendments that RCA failed to obtain in April of 2016. (*Id.* at ¶ 55).

Three months later, RCA issued another proxy to its shareholders seeking approval for, among other things, the removal of certain provisions in its charter related to merger transactions and the merger agreement with AFIN. (*Id.* at ¶ 63). The proxy relied heavily on AFIN's estimated per share NAV of $24.17 as of December 31, 2015, allegedly taking no heed of the estimate's staleness and thus its inaccuracy. (*Id.* at ¶¶ 64-65). The plaintiffs allege that by December 31, 2016, AFIN's NAV dropped to $23.37 per share, (*id.* at ¶ 65), the NAV was based on a deflated capitalization rate, (*id.* at ¶ 66), AFIN had suffered a sizable loss in a real estate deal, (*id.* at ¶ 67), and had to pay $27.3 million in fees related to SunTrust properties during 2016, (*id.* at ¶ 70). The proxy also relied on AFIN growth projections, which the plaintiffs claim failed to incorporate important financial statistics, in addition to charges incurred by some of its properties. (*Id.* at ¶¶ 70-71). Moreover, the proxy: included BMO's analysis, which relied on AFIN's allegedly misleading growth prospects; failed to explain the conflicting valuations of AFIN stock reached by BMO and another analyst, UBS Securities, LLC; did not specify what market conditions kept AFIN out of the New York Stock Exchange; failed to disclose that Rendell and Michelson earned a significant salary as directors of AR Global affiliated entities;

did not disclose "strategic counterparts" or whether other offers solicited after the merger was agreed to included future involvement of AR Global; that RCA's 45 day go shop period was affected by AR Global's disclosure of fraud at two of its affiliates; and that the 45 day go shop period was unrealistically short. (*Id.* at ¶¶ 72-74).

Notwithstanding these alleged deficiencies, shareholders approved the merger and charter amendments on February 13, 2017. (*Id.* at ¶ 76). Three days later, the merger was completed. (*Id.*). Over the next four months, AFIN made five disclosures, allegedly for the first time: (1) Michelson and Rendell joined AFIN's board of directors; (2) AFIN disclosed that it paid a $27.3 million fee related to some of its properties; (3) its NAV dropped to $23.37; (4) a decrease in its rental income from the same time the year before and an additional property related fee of $3.9 million; and (5) that it was limiting its share repurchase program and reducing its dividend from $1.65 per share to $1.30 per share. (*Id.* at ¶¶ 77-81).

The plaintiffs filed a class action complaint in January 2017, before the merger, which they amended in June 2017, (ECF No. 54), claiming that the defendants violated various federal and state laws in connection with the proxy statement and the merger. The complaint does not allege fraud, intentional conduct, or recklessness as to any defendant. All defendants have moved to dismiss the complaint for failure to state a claim, (ECF Nos. 61-64), and the defendants AR Global and RCA Advisor also have moved to dismiss for lack of personal jurisdiction, (ECF No. 63).

**Standard of Review**

To survive a motion to dismiss for failure to state a claim, the factual allegations of a complaint "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atlantic Corp. v.*

*Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). "To satisfy this standard, a plaintiff need not 'forecast' evidence sufficient to prove the elements of the claim. However, the complaint must allege sufficient facts to establish those elements." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citation omitted). "Thus, while a plaintiff does not need to demonstrate in a complaint that the right to relief is 'probable,' the complaint must advance the plaintiff's claim 'across the line from conceivable to plausible.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). And the plaintiff typically must do so by relying solely on facts asserted within the four corners of his complaint. *Zak v. Chelsea Therapeutics Intern., Ltd.*, 780 F.3d 597, 606-07 (4th Cir. 2015).

## Analysis[1]

The plaintiffs claim that by promulgating a misleading proxy, pushing RCA into a merger agreement for personal benefit, and failing to adequately assess the merits of the merger one or more of the defendants violated several provisions of the Securities and Exchange Acts. These claims will be dismissed because the plaintiffs fail to plausibly show that the proxy was misleading. Because the court will dismiss the plaintiffs' federal claims, it will choose not to exercise supplemental jurisdiction over the plaintiffs' remaining state law claims. Accordingly, it is not necessary to address the issue of personal jurisdiction.

I. Violation of § 14(a) of the Exchange Act and SEC Rule 14a-9 – (Count I)

On the merits, the plaintiffs first assert that RCA and its three directors, Michelson, Rendell, and Weil, violated § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, by promulgating a false and misleading proxy during the vote to amend the RCA Charter and approve the merger between RCA and AFIN.

---

[1] Because the court will grant the defendants' motions to dismiss, it will not consider the merits of certifying the plaintiffs' class.

SEC Rule 14a-9 makes it unlawful to make a proxy statement:

> which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same . . . subject matter which has become false or misleading.

17 C.F.R. § 240.14a-9(a).[2] The rule activates "when management seeks consent or authorization for actions requiring such approval." *Allen v. Lloyd's of London*, 94 F.3d 923, 931 (4th Cir. 1996) (internal quotation marks omitted).

A defendant violates Rule 14a-9 by making a material false or misleading statement or omitting material information in a proxy.[3] A fact is material "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1090 (1991). The court must consider the "full context in which" the allegedly unlawful statements were made, including cautionary language captured by the so-called "bespeaks caution" doctrine, which counsels dismissal "if cautionary language in the offering document negates the materiality of the alleged misrepresentations or omissions." *Gasner v. Bd. of Supervisors of the Cty. Of Dinwiddie, Va.*, 103 F.3d 351, 358 (4th Cir. 1996).

The plaintiffs identify several misleading statements or omissions in RCA's proxy, including AFIN's inaccurate NAV; AFIN's inaccurate growth projections; BMO and UBS's inaccurate and misleading valuation opinions; and a number of omitted facts that were necessary to keep the proxy from becoming misleading.

---

[2] Section 14a-9 empowers the SEC to make rules governing proxies. 15 U.S.C. § 78n(a).
[3] The Supreme Court has recognized a private right of action under SEC Rule § 14a-9. *Sandberg*, 501 U.S. at 1086-87.

A. AFIN's NAV

According to the plaintiffs, the NAV reported in RCA's proxy was misleading because it was out-of-date, was based on the wrong capitalization rate for AFIN's properties, represented AFIN as financially healthy, and failed to note AFIN's losses on some of its properties, including fees related to its SunTrust properties. They claim the proxy also failed to disclose the deadline to finalize the merger to avoid disclosing an updated NAV.

A proxy statement is not unlawful under Rule 14a-9 simply because it makes inaccurate statements or omits information; it is unlawful only if, by what it states or omits, it contains *misleading* information. The NAV was about a year old and therefore was likely inaccurate, but the proxy disclosed that information, flagged that AFIN prepares its NAV annually, and even noted that the NAV "does not reflect events subsequent" to the valuation. (ECF No. 61, Ex. 1 ("Proxy") at 36, 58.[4] At the time of the merger it was the most recent valuation of AFIN stock, and the proxy disclosed information sufficient to put shareholders on notice of its potential flaws. Indeed, as further discussed below, the proxy "warned investors of the very risks [the plaintiffs] claim[] were not disclosed, *Recupito v. Prudential Securities, Inc.*, 112 F. Supp. 2d 449, 457 (D. Md. 2000), by cautioning that "RCA stockholders cannot be sure of the market value of the AFIN common stock they will receive upon completion of the merger," (Proxy at 36).[5]

---

[4] The court may consider a document "attached to a motion to dismiss . . . when the document is integral to and explicitly relied on in the complaint." *Zak v. Chelsea Therapeutics Intern., Ltd.*, 780 F.3d 597, 606-07 (4th Cir. 2015) (internal quotation marks omitted).

[5] In bold headings, the proxy also warned that "[t]he value of the RCA per share merger consideration has been estimated based on AFIN's published estimated per share NAV and AFIN's published estimated per share NAV may be lower than the market price of AFIN common stock when the AFIN common stock is listed on the NYSE," (Proxy at 36), and "[t]he shares of AFIN common stock are newly approved for listing on the NYSE and have never been traded on a national securities exchange and as such have no trading history and there can be no assurance that the trading price of AFIN common stock will equal or exceed AFIN's published estimated per share NAV as of December 31, 2015," (Proxy at 42).

The plaintiffs' remaining grievances with the proxy also are cured by the proxy's disclosures. Assuming without deciding that the properties identified in the complaint could materially affect AFIN's NAV, at bottom, the plaintiffs are merely reasserting their argument that the NAV is stale because it omits more recent financial data. As already noted, the NAV expressly disclaims any representation that the December 2015 NAV reflects subsequent events, like losses suffered from property sales. Moreover, the proxy warned that AFIN's investments "are subject to the risks typically associated with commercial real estate investments" like "declines in regional or local real estate values," (Proxy at 41-42), further advising the plaintiffs that the NAV, like any estimate, may not represent the current state of the market. But, most importantly, the proxy also disclosed that AFIN had "incurred cumulative net losses . . . equal to $62.6 million" between January 2013 and September 30, 2016, (Proxy at 43), encompassing all but three months of the losses the plaintiffs flag in their complaint, (Am. Compl. ¶ 71). To be sure, this statement does not identify AFIN's losses on the SunTrust properties directly; but it does more by acknowledging *all* losses AFIN suffered over three years.

Still more, the proxy tried to dispel any reliance on any faulty understanding of AFIN as either a financially healthy company, or a company with a healthy financial future, by frankly stating: "The extent of AFIN's future operating losses and the timing of [its] profitability are highly uncertain, and AFIN may never achieve or sustain profitability." (Proxy at 43). And it disavowed any representation that the method used to calculate AFIN's capitalization rate, or the result the method reached, were perfect. Indeed, the proxy implied that the method, although being the one most commonly used, was only one of many approaches, and further noted that "[t]he estimated property values may not, however, represent current market value or book value" and "the methodologies employed to value the real estate assets by the independent

valuer, and the recommendations made by the AFIN Advisor, were based upon a number of estimates and assumptions that may not be accurate or complete." (Proxy at 60). The plaintiffs also claim that the proxy was misleading because it failed to disclose the merger deadline, but it did. On page 39, the proxy notes that AFIN and RCA have "the right to terminate the merger agreement if the merger has not occurred by March 6, 2017," the date the plaintiffs identify as the undisclosed deadline in their complaint, (Am. Compl. ¶ 69).[6]

Ultimately, the plaintiffs arguments may be reduced to this: The valuation of AFIN represented in the proxy is misleading because of an old NAV, inaccurate financial information, a poorly calculated capitalization rate, and losses on the SunTrust property it failed to disclose. But never once does the proxy ever unconditionally assert AFIN's value. The proxy itself treated the NAV skeptically, noted its staleness, and warned that any "forward-looking statements are subject to a number of risks," (Proxy at 53); it acknowledged AFIN's significant losses, and noted that it may never be profitable; and candidly disclosed the method used to calculate its capitalization rate, asserted that it believed it was the dominant method, but warned that the calculation is only an estimate and may not represent the company's true value. Even if omitted information may have affected AFIN's NAV, the proxy left no room for a reasonable investor to believe that the NAV chiseled AFIN's value in stone. For these reasons, the proxy warned of the very risks the plaintiffs allege.

---

[6] The proxy warned of several other risks that the plaintiffs allege the proxy failed to disclose, including that: (1) "[c]ertain of the directors and executive officers of each of AFIN and RCA may have interests in the merger that are different from, or in addition to, those of the other AFIN stockholders and RCA stockholders, respectively," and that Michelson and Rendell "will serve as directors of AFIN following the consummation of the merger,"(Proxy at 37-38); (2) "[t]he merger agreement contains provisions that could discourage a potential competing acquirer or could result in any competing proposal being at a lower price than it might otherwise be," (Proxy at 38); (3) "AFIN will have additional indebtedness following the merger and may need to incur more in the future," (Proxy at 39); (4) "[a]lthough the shares of AFIN common stock have been approved for listing on the NYSE . . . the shares are not expected to commence trading immediately upon the merger being completed" and "[t]here can be no assurance when AFIN common stock will commence trading on the NYSE or whether the AFIN shares will trade at a price equal to or greater than the estimated NAV per share of the AFIN common stock," (Proxy at 42); (5) "AFIN cannot assure you that it will continue paying [share] distributions at the current rate or at all," (Proxy at 43); and (6) investors may access all of AFIN's filings with the SEC, (Proxy at 63).

B. AFIN's Growth Projections

The plaintiffs argue that AFIN's growth prediction was misleading because it failed to disclose certain losses, that some of its 2016 financial numbers had declined from 2015, and facts regarding its acquisition of properties that would cut against the predictions in the proxy. But, like the NAV, the defendants expressly warned of the risks associated with relying on any prediction.

While "expressions of belief concerning current facts may be material," forecasts of future performance "not worded as guarantees are generally not actionable under federal securities laws," *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 290 (4th Cir. 1993) (internal citation omitted), especially "if cautionary language in the offering document negates the materiality of the alleged misrepresentations or omissions," *Gasner*, 103 F.3d at 358.

Disregarded by the plaintiffs' complaint are various warnings, in addition to those noted above: public forecasts like AFIN's growth predictions are "uncertain[], unpredictab[le], and subjectiv[e];" shareholders should not rely on such projections, which the proxy explained would not be updated, and several other factors that might cause an inaccurate projection. (Proxy at 35, 121-22).[7]

RCA shareholders were expressly told not to consider AFIN's projections as guarantees for reasons that mirror the plaintiffs' concerns: any prediction is speculative and may be stale. Considering the full mix of statements in the proxy, the plaintiffs do not plead sufficient facts to support their argument that AFIN's projections violate Rule 14a-9.

---

[7] The plaintiffs also fail to acknowledge that one of the impairment charges suffered by AFIN was paid in 2017 and therefore could not have affected the company's projections in 2016. (Am. Compl. at ¶ 71).

C. BMO's and UBS's Valuations

Next the plaintiffs claim that the opinions of BMO and UBS were misleading because they relied on inappropriate information and failed to explain why their cash flow analyses conflicted. But a reasonable shareholder "distinguishes between the sentences 'we believe X is true' and 'X is true,'" grasping "that [the former] convey[s] some lack of certainty as to the statement's content." *Omnicare, Inc. v. Laborers Dist. Council Const. Industry Pension Fund*, 135 S. Ct. 1318, 1328 (2015). Thus, an opinion should not be found misleading unless an investor can "identify particular (and material) facts going to the basis for the issuer's opinion— facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have— whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Id.* at 1332.

The plaintiffs do not dispute that BMO and UBS merely offered their opinions on AFIN's valuation, yet they maintain the opinions nevertheless violated Rule 14a-9 because they relied on AFIN's own future projections. But BMO disclosed that it "assumed, without independent investigation" that AFIN's projections were "reasonably prepared and reflect the best currently available estimates." (Proxy at 124). If the plaintiffs did have reason to rely on BMO's valuation as a guarantee, they certainly could not be misled after the company's disclosure of the very thing the plaintiffs argue is misleading. The plaintiffs face "no small task" when attempting to argue that an opinion is misleading. For the reason stated, they fail to meet their burden. *Omnicare*, 135 S. Ct. at 1332.

D. Additional Facts

Finally, the plaintiffs argue that the defendants had a duty to disclose six additional facts: the unfavorable market conditions that caused AFIN to drop its planned NYSE listing; Rendell's

11

and Michelson's connection to AR Global; the strategic counterparties involved in the merger discussions; whether offers from third parties included future RCA involvement with AR Global; that the 45-day go-shop period was affected by AR Global's disclosures of fraud and hindered by AFIN's NAV; and the merger agreement's termination fees.

A proxy need only disclose those facts necessary to prevent shareholders from being misled. The plaintiffs' complaint never identifies how the omission of any one of these facts produced a misleading proxy, in light of all the other disclosures and warnings discussed above. This argument fails to state a claim.

*** 

Because the proxy sufficiently disclosed the very risks identified by the plaintiffs, cautioned shareholders where necessary, and qualified its opinions such that they would not have misled a reasonable shareholder, the proxy did not violate SEC Rule 14a-9. Accordingly, the plaintiffs' first claim will be dismissed.

II.     Violation of § 13 of the Exchange Act and SEC Rule 13e-3 – (Count II)

The plaintiffs next argue that RCA and AFIN violated 15 U.S.C. § 78m(e) and 17 C.F.R. § 240.13e-3. Liability under 17 C.F.R. § 240.13e-3 attaches only to a set of defined transactions that have:

> either a reasonable likelihood or a purpose of . . . (A) [c]ausing any class of equity securities of the issuer which is subject to section 12(g) or section 15(d) of the Act to become eligible for termination of registration under Rule 12g-4 . . . or Rule 12h-6 . . . or causing the reporting obligations with respect to such class to become eligible for termination under Rule 12h-6 . . . or suspension under Rule 12h-3 or section 15(d); or (B) [c]ausing any class of equity securities of the issuer which is either listed on a national securities exchange or authorized to be quoted in an inter-dealer quotation system of a registered national securities association to be neither listed on any national securities exchange nor authorized to be quoted on an inter-dealer quotation system of any registered national securities association.

17 C.F.R § 240.13e-3(a)(3)(ii)(A)-(B). For qualifying transactions, the section makes it unlawful for "an issuer . . . subject to section 12 of the [Exchange] Act . . . [t]o make any untrue statement of a material fact or to omit to state a material fact" necessary to prevent statements connected to the transaction from becoming misleading. 17 C.F.R. § 240.13e-3(b)(1)(ii). Whether SEC Rule 13e-3 creates a private right of action is an unsettled question, s*ee Polar Intern. Brokerage Corp. v. Reeve*, 108 F. Supp. 2d 225, 246 n.35 (S.D.N.Y. 2000), and the Fourth Circuit has not yet addressed the issue. But even if there were a private action under the section, the plaintiffs' claim would be dismissed for two reasons.

First, assuming without deciding that the merger underlying this suit falls within the set of transactions covered by Rule 13e-3, the plaintiffs have not alleged that it had a reasonable likelihood or purpose of causing any class of equity securities to be terminated or suspended under the regulations identified in the Rule, or to be removed from a national securities exchange or to lose its authorization to be quoted on an inter-dealer quotation system. As a result, the plaintiffs fail to meet the threshold requirements under the Rule.

Second, even if the plaintiffs were able to meet their threshold burden, they fail to plead sufficient facts to support their allegations that the proxy underlying the merger agreement contained misleading statements or misleading omissions for the reasons stated in Section I. For all these reasons, the plaintiffs' claims under SEC Rule 13e-3 will be dismissed.

III. Violation of § 20(a) of the Exchange Act – (Count III)

The plaintiffs assert that Michelson, Rendell, Weil, and AR Global violated 15 U.S.C. § 78t(a), which makes any person "who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder . . . liable jointly and severally with and to the same extent as such controlled person . . . unless the controlling person acted in

good faith and did not directly or indirectly induce the act . . . constituting the violation or cause of action," 15 U.S.C. § 78t(a), by controlling the content and dissemination of statements in the proxy the plaintiff claims violated §§ 13 and 14 of the Exchange Act.

Liability under section 20(a) of the Exchange Act only exists if there is also liability under a different section of the Act. *See Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 894 n.8 (4th Cir. 2014). Because the court will dismiss the plaintiffs' claims under sections 13 and 14 of the Exchange Act, it will also dismiss their claim under section 20(a).

IV. Violation of § 11 of the Securities Act – (Count IV)

Next the plaintiffs argue that AFIN, Weil, Radesca, Gong, Perla, and Kabnick violated 15 U.S.C. § 77k by incorporating untrue statements of material fact in the proxy which became part of a registration statement with the SEC and omitted facts necessary to keep the registration statement from being misleading.

Section 11 of the Securities Act imposes liability on every person who signs a registration statement that contains "an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a); *see also Omnicare*, 135 S. Ct. at 1323 ("Section 11 thus creates two ways to hold issuers liable for the contents of a registration statement—one focusing on what the statement says and the other on what it leaves out.").

For the reasons explained in Section I, the proxy statement neither included misleading statements nor omitted information necessary to keep the proxy from becoming misleading. Accordingly, this claim also will be dismissed.

V.   Violation of § 12(a)(2) of the Securities Act – (Count V)

The plaintiffs' final claim grounded in the proxy, this time against AFIN and Weil, arises under 15 U.S.C. § 77*l*(a)(2) of the Securities Act.

Section 12(a)(2) makes it unlawful to offer or sell a security "by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements . . . not misleading." 15 U.S.C. § 77*l*(a)(2); *see also Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 567 (1995). Section 12 only imposes liability on those who make or solicit offers of securities and does not impose "liability for mere participation in unlawful sales transactions." *Pinter v. Dahl*, 486 U.S. 622, 650 (1988).

Assuming, without deciding, that Weil made or solicited offers for AFIN stock, Weil and AFIN are nonetheless not liable under the Act. Relying, again, on the reasons stated in Section I, the proxy was not unlawfully misleading, and this claim, too, will be dismissed.

VI.   Violation of § 15 of the Securities Act – (Count VI)

The plaintiffs again seek to impose liability on a defendant—AR Global—for controlling unlawful activity. They claim that AR Global is liable, this time under 15 U.S.C. § 77*o*, for controlling the conduct that allegedly violated sections 11 and 12 of the Securities Act.

Like section 20(a) of the Exchange Act, section 15 "imposes derivative liability on certain 'control persons' for primary violations of the [Securities] Act." *Yates*, 744 F.3d at 901 n.14. Also like section 20(a) of the Exchange Act, the court should dismiss a claim arising under section 15 if it dismisses the primary violation on which liability relies. *See id.*

Because the court will dismiss the claims brought under the Securities Act, the court also will dismiss the plaintiffs' section 15 claim.

VII.    Remaining State Law Claims

The court will choose not to exercise jurisdiction over the plaintiffs' remaining state law claims. Under 28 U.S.C. § 1367 the court may exercise supplemental jurisdiction over state law claims "that are so related to the claims in the action within [the court's] original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). The district court, however, "may decline to exercise supplemental jurisdiction over" any such claim if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Because the court will dismiss all of the plaintiffs' federal claims, and because the remaining claims involve factually related but legally distinct issues of state securities and corporation law, the court will exercise its "wide latitude in determining whether or not to retain jurisdiction over state claims when all federal claims have been extinguished" to decide against doing so here. *Hall v. Greystar Management Services, L.P.*, 193 F. Supp. 3d 522, 526 (D. Md. 2016) (quoting *Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th Cir. 1995).

**Conclusion**

For the reasons stated above, the complaint will be dismissed. A separate order follows.

_____March 28, 2018_____      _____/s/_____
           Date                                                           Catherine C. Blake
                                                                          United States District Judge