FILED: March 11, 2019

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

No. 18-1483
(1:17-cv-00132-CCB)

_____

PARADISE WIRE & CABLE DEFINED BENEFIT PENSION PLAN;
HOLLINGSWORTH, MENDENHALL AND MCFADDEN, LLC; IG
HOLDINGS, INCORPORATED; IG REVOCABLE TRUST; DR. STUART
WOLLMAN; SHEILA ROSENBERG; RENE DEMEULE, Individually on behalf
of themselves and all others similary situated

          Plaintiffs - Appellants

v.

EDWARD M. WEIL, JR.; AMERICAN REALTY CAPITAL RETAIL
ADVISOR, LLC; DAVID GONG; LISA D. KABINICK; STANLEY PERLA;
NICHOLAS RADESCA; LESLIE D. MICHELSON; EDWARD G. RENDELL;
AMERICAN REALTY CAPITAL - RETAIL CENTERS OF AMERICA,
INCORPORATED; AR GLOBAL INVESTMENTS LLC; AMERICAN
FINANCE TRUST, INCORPORATED

          Defendants - Appellees

_____

J U D G M E N T

_____

In accordance with the decision of this court, the judgment of the district

court is affirmed.

This judgment shall take effect upon issuance of this court's mandate in accordance with Fed. R. App. P. 41.

/s/ PATRICIA S. CONNOR, CLERK

**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 18-1483

PARADISE WIRE & CABLE DEFINED BENEFIT PENSION PLAN; HOLLINGSWORTH, MENDENHALL AND MCFADDEN, LLC; IG HOLDINGS, INCORPORATED; IG REVOCABLE TRUST; DR. STUART WOLLMAN; SHEILA ROSENBERG; RENE DEMEULE, Individually on behalf of themselves and all others similarly situated,

Plaintiffs - Appellants,

v.

EDWARD M. WEIL, JR.; AMERICAN REALTY CAPITAL RETAIL ADVISOR, LLC; DAVID GONG; LISA D. KABINICK; STANLEY PERLA; NICHOLAS RADESCA; LESLIE D. MICHELSON; EDWARD G. RENDELL; AMERICAN REALTY CAPITAL - RETAIL CENTERS OF AMERICA, INCORPORATED; AR GLOBAL INVESTMENTS LLC; AMERICAN FINANCE TRUST, INCORPORATED,

Defendants - Appellees.

Appeal from the United States District Court for the District of Maryland, at Baltimore. Catherine C. Blake, District Judge. (1:17-cv-00132-CCB)

Argued: December 11, 2018                    Decided: March 11, 2019

Before NIEMEYER, DUNCAN, and QUATTLEBAUM, Circuit Judges.

Affirmed by published opinion. Judge Quattlebaum wrote the opinion, in which Judge Niemeyer and Judge Duncan joined.

**ARGUED:** Jeffrey Simon Abraham, ABRAHAM, FRUCHTER & TWERSKY, LLP, New York, New York, for Appellants. George Stewart Webb, Jr., VENABLE LLP, Baltimore, Maryland, for Appellees. **ON BRIEF:** John B. Isbister, TYDINGS & ROSENBERG, LLP, Baltimore, Maryland, for Appellants. John T. Prisbe, Michael J. Wilson, VENABLE LLP, Baltimore, Maryland, for Appellees American Finance Trust, Inc. and American Realty Capital – Retail Centers of America, Incorporated. Reid M. Figel, David L. Schwarz, Daniel V. Dorris, KELLOGG HANSEN TODD FIGEL & FREDERICK PLLC, Washington, D.C., for Appellees American Realty Capital Retail Advisor, LLC, AR Global Investments LLC, Nicholas Radesca and Edward M. Weil, Jr. Jay A. Dubow, Matthew D. Foster, Christopher B. Chuff, PEPPER HAMILTON LLP, Philadelphia, Pennsylvania, for Appellees David Gong, Lisa Kabnick, and Stanley Perla. Eric N. Whitney, Jeffrey A. Fuisz, ARNOLD & PORTER KAYE SCHOLER LLP, New York, New York, for Appellees Leslie D. Michelson and Edward G. Rendall.

---

2

QUATTLEBAUM, Circuit Judge:

This case arises from the merger of American Realty Capital - Retail Centers of America, Inc. ("RCA") and American Finance Trust, Inc. ("AFIN"). After the merger, the shareholders of RCA discovered information about AFIN's financial condition that indicated AFIN was worth less and was less healthy than represented in the proxy statement that induced their vote for the merger. Believing they had been misled, the RCA shareholders sued alleging the proxy statement was false and misleading under the federal securities laws. However, the statements complained of were not false or misleading and the alleged omissions were addressed by narrowly tailored warning language. Therefore, we affirm the district court's dismissal of the claims.

I.

RCA and AFIN's merger stems from their relationship with a business known as AR Global Investments LLC ("AR Global").[1] AR Global, directly and through entities it owns, creates and sells ownership interests in real estate investment trusts, which are sometimes referred to as REITs.[2] AR Global's affiliates then manage the day-to-day operations of those REITs including the purchase, sale and rental of real estate assets. This business model has historically produced substantial fee revenue for AR Global.

---

[1] The facts described are taken from the complaint since we review the district court's order granting a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

[2] REITs in a general sense are modeled after mutual funds and purport to provide smaller investors the opportunity to share in the risks and rewards of real estate investment with relatively favorable tax consequences.

3

Consistent with its business model, AR Global, through an affiliated company, created RCA and AFIN and sold ownership interests in them. In addition, one of AR Global's affiliates managed their day-to-day operations.

In 2014 and 2015, financial improprieties regarding several companies affiliated with AR Global became public. As a result, a number of the REITs with whom AR Global had management contracts terminated AR Global as their asset manager. Fearing the loss of management fee revenue from additional terminations, AR Global developed a plan to prevent other REITs from terminating their contracts. To effectuate this plan, AR Global attempted to merge REITs with freely terminable management agreements into REITs with longer management agreements that were more difficult, if not virtually impossible, to break.

AFIN had a management contract with AR Global that was difficult to terminate because it had a twenty-year term. By contrast, RCA had a management contract that could be easily terminated because it only required sixty days' written notice and could be terminated without cause. Consistent with its plan, AR Global sought to merge RCA into AFIN to prevent RCA from terminating AR Global as its asset manager, thereby protecting future management fee revenues.

In response to the efforts of AR Global, in early 2016, AFIN and RCA began merger negotiations. On September 7, 2016, RCA announced a merger agreement between the two REITs. Under the terms of the agreement, RCA was to merge into AFIN so that AFIN would be the surviving entity after the merger. In other words, the RCA shareholders would become AFIN shareholders. The merger agreement provided that the

4

RCA shareholders would receive a combination of cash and AFIN stock, estimated to be $10.26, in exchange for each of their RCA shares.

The merger had to be approved by RCA's shareholders. To solicit the shareholders' vote on the merger, on or about December 16, 2016, RCA's directors disseminated a proxy statement (the "Proxy") to the RCA shareholders. Like the merger agreement, the Proxy estimated that the RCA shareholders would receive $10.26 per RCA share from the merger.

An estimate, by its very nature, is not certain. To know the actual—rather than estimated—value the RCA shareholders would receive for their RCA shares, the current per share net asset value ("NAV") of AFIN stock would have been needed. However, AFIN's most recent calculation of its NAV was effective as of December 31, 2015. As of that date, the value of AFIN's NAV was $24.17. Even though it was almost a year old at the time, AFIN's $24.17 NAV, effective as of December 31, 2015, was used to arrive at the $10.26 per share estimate of the value to be received by the RCA shareholders.

Of course, changes in AFIN's NAV after December 31, 2015, would necessarily affect the actual value received by the RCA shareholders from the merger. If the NAV increased after December 31, 2015 due to improvements in AFIN's financial condition, the actual value to the RCA shareholders from the merger would be greater than the $10.26 per share estimate. On the other hand, if AFIN's fortunes worsened and the NAV decreased from its December 31, 2015 value, the actual per share value to the RCA shareholders from the merger would be less than $10.26.

5

In addition to the information about the value to be received by the RCA shareholders, the Proxy also contained information about AFIN and its financial condition, including projections of AFIN's future financial performance. These projections were referred to as Standalone Projections.

In February 2017, the RCA shareholders narrowly approved the merger by a 50.21% majority. Shortly after the merger, industry commentators began to question the financial benefit of the merger to the RCA shareholders. For example, an industry publication issued an article entitled "St. Valentine's Day Massacre" which described the damage the merger inflicted on the RCA shareholders.[3]

In the months following the merger, the RCA shareholders learned from several SEC filings from AFIN information about AFIN's financial condition the shareholders did not know before the merger. First, they learned of a $27.3 million loss to AFIN caused by SunTrust Bank's decision not to renew leases for forty-five bank branches. Second, they learned that AFIN's estimated NAV as of December 31, 2016, was $23.37 per share, down from the $24.17 per share value referenced in the merger agreement and the Proxy. Third, they learned AFIN's real estate rental income (excluding income on properties previously owned by RCA and acquired in the merger) had decreased by 3.7%

---

[3] The phrase "St. Valentine's Day Massacre" was popularized by the 1929 shooting ordered by the notorious mobster Al Capone. On February 14, 1929, in retaliation for George "Bugs" Moran placing a bounty for Capone's death, Capone ordered the destruction of Moran and his gang. In carrying out Capone's orders, the men dressed as police officers, entered Moran's headquarters, lined up Moran's henchmen and executed them.

from the same quarter the year before. Fourth, they learned AFIN was reducing its annual

dividend distribution by more than 20%. Fifth, the RCA shareholders learned of AFIN's

January 31, 2017 sale of its Merrill Lynch properties at a higher capitalization rate than

the capitalization rate used to calculate the December 31, 2015 NAV and thus at a price

that might lower AFIN's NAV.

Believing this information was known at the time of the merger and should have

been disclosed in the Proxy, eight named plaintiffs brought this putative class action on

behalf of the former RCA shareholders (the "RCA Shareholders"). They alleged RCA,

along with its directors Leslie D. Michelson and Edward G. Rendell and AR Global's

CEO Edward M. Weil, Jr. ("Defendants")[4], violated Section 14(a) of the Securities

Exchange Act and Securities and Exchange Commission ("SEC") Rule 14a-9 by

disseminating a false and misleading proxy statement to solicit approval of the merger

between RCA and AFIN. Defendants moved to dismiss this claim pursuant to Rule

12(b)(6) of the Federal Rules of Civil Procedure. The district court granted the motions

---

[4] In addition to these defendants, the RCA Shareholders also sued AR Global, its affiliate American Realty Capital Retail Advisor, LLC and AFIN along with AFIN's directors Nicholas Radesca, David Gong, Stanley Perla and Lisa D. Kabinick. The RCA Shareholders alleged nine counts of securities laws violations. The district court dismissed all nine. Only two were appealed. AR Global, American Realty Advisor, LLC, Radesca, Gong, Perla and Kabinick were named as defendants in the counts that were dismissed by the district judge, but not appealed.

All of these defendants are listed as active parties in the district court's order and on our docket. However, Michelson, Rendell, AR Global Investments LLC, AFIN and RCA do not appear to remain defendants after the amended complaint was filed. To the extent they do remain, however, any claims against them would be dismissed by this decision.

related to this claim. The RCA Shareholders timely appealed, and we have jurisdiction of this appeal pursuant to 28 U.S.C. § 1291.

II.

This Court reviews an order granting a motion to dismiss de novo. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009). A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of the claims pled in a complaint. To sufficiently plead a claim, the Federal Rules of Civil Procedure require that "[a] pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." Fed. R. Civ. P. 8(a)(2).

To meet the Rule 8 standard and survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To contain sufficient factual matter to make a claim plausible, the factual allegations must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

A court should grant a Rule 12(b)(6) motion if, "after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999).

8

III.

Using this standard, we review the RCA Shareholders' Section 14(a) and Rule 14a-9 claim. Section 14(a) makes it unlawful to solicit a proxy in violation of applicable SEC rules and regulations. 15 U.S.C. § 78n(a). SEC Rule 14a-9, promulgated pursuant to Section 14(a), prohibits the solicitation of proxies through a proxy statement that contains false or misleading material facts or omits any material fact that leaves a proxy statement false or misleading.[5]

Whether a statement or omission is materially misleading "depends on the perspective of a reasonable investor." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1327 (2015). For a fact to be material, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976) (internal quotation marks omitted).

---

[5] SEC Rule 14a-9 states:

No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

17 C.F.R. § 240.14a-9(a).

The RCA Shareholders allege the Proxy was materially misleading due to its statements and omissions regarding: (A) the AFIN NAV; (B) the sale of the Merrill Lynch properties; (C) SunTrust Bank; and (D) the AFIN Standalone Projections. We address these allegations in turn.

A.

The RCA Shareholders argue that the Proxy's repeated references to AFIN's NAV as $24.17 were materially false or misleading because, by the time the Proxy was issued, AFIN's NAV was no longer $24.17. The RCA Shareholders claim that, by the time the Proxy was disseminated, the events causing AFIN's NAV to decrease were known and should have been disclosed. To put it plainly, they claim the information about the NAV in the Proxy was outdated, and that Defendants knew it but failed to disclose the updated information.

To consider those allegations, we turn to the language of the Proxy which the RCA Shareholders incorporated into the amended complaint by reference. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (holding that a court may consider documents incorporated into the complaint by reference when ruling on a 12(b)(6) motion). The Proxy stated AFIN's NAV of $24.17 was effective as of December 31, 2015. The RCA Shareholders do not allege the NAV was incorrect as of that date.

10

Moreover, the Proxy did not state AFIN's current NAV was $24.17. Therefore, the statements in the Proxy about the NAV were not false or misleading.[6]

Regarding the RCA Shareholders' allegation that AFIN's NAV should have been updated, the Proxy included multiple warnings on that very point. First, the Proxy warned that AFIN's NAV of $24.17 did not reflect events after December 31, 2015, that would affect AFIN's NAV. Second, the Proxy warned that the exchange rate, which was based on the NAV, would not be updated. Third, the Proxy warned that changes in the business, operations, financial position and prospects of either company might affect the value of AFIN or RCA. Fourth, the Proxy warned that the RCA Shareholders could not be sure of the value of AFIN's common stock they would receive upon finalization of the merger.[7]

This warning language in the Proxy implicates what is known as the "bespeaks caution" doctrine. Under that doctrine, claims are "subject to dismissal if cautionary language in the offering document negates the materiality of the alleged misrepresentations or omissions." *Gasner v. Bd. of Supervisors*, 103 F.3d 351, 358 (4th Cir. 1996). While general warnings may not negate the materiality of misrepresentations

---

[6] To further address this point, the December 31, 2015 NAV estimate was approved and released by AFIN on March 17, 2016. The Proxy stated that AFIN prepares annual statements of estimated share values. Consistently, AFIN's next NAV estimate was released approximately a year later.

[7] The Proxy even included a summary of the financial analysis prepared by BMO Capital Markets Corp. ("BMO") which served as AFIN's financial advisor for the merger. The analysis revealed that AFIN's NAV was likely not $24.17 at the time of the merger. As the amended complaint points out, BMO's analysis indicated that AFIN's NAV was between $20.65 and $23.37.

or omissions, specific warnings that are tailored to address the alleged misrepresentation or omission may negate their materiality when the total mix of information would not be significantly altered by the disclosures sought by the plaintiffs. *Compare Singer v. Reali*, 883 F.3d 425, 442–43 (4th Cir. 2018) (finding that despite the general warnings, the omission in question was materially misleading because the reasonable investor would have viewed the total mix of information significantly altered if the omission had been disclosed), *with Gasner*, 103 F.3d at 359–60 (dismissing claims of misrepresentation and omissions where the cautionary statements were tailored precisely to address the alleged misrepresentation or omission).[8]

Unlike the brief and general warning this Court found insufficient to preclude a claim in *Singer*, the warnings in the Proxy are extensive, specific and tailored. Further, they address the very complaints the RCA Shareholders make about the NAV. As such, even accepting the allegations about the NAV as true, the warnings here negated the materiality of the alleged statements and omissions concerning the $24.17 NAV as of

---

[8] The caselaw on which we rely in reaching our result was largely developed in the context of SEC Rule 10b-5. Other circuits have construed Rule 10b-5 and Rule 14a-9 similarly in defining misleading statements and omissions. *See, e.g., Scattergood v. Perelman*, 945 F.2d 618, 622 (3d Cir. 1991) (explaining that, with respect to the materiality requirement, "Rule 14a-9 can be viewed simply as a twin of Rule 10b-5 applicable to misleading statements and omissions in proxy materials"); *Golub v. PPD Corp.*, 576 F.2d 759, 764 (8th Cir. 1978) (explaining that "a decision . . . rendered in the context of a Rule 10b-5 suit may well be applicable in a case involving [§] 14(a) and Rule 14a-9" because the two rules "are in pari materia and should be similarly construed"). We follow our sister circuits here and hold that the materiality doctrines at issue in this case that were developed in the Rule 10b-5 context are also applicable in the Rule 14a-9 context.

December 31, 2015. To find otherwise would be to ignore the express warning language of the Proxy.

In their briefs, the RCA Shareholders point to authority for the proposition that statements can be misleading if factual information in disclosure documents is known to be false. Significantly, however, this case does not involve such a situation. This case involves statements that were allegedly false and misleading because they were outdated. But the statements identified their effective date and are not disputed as of that effective date. Further, they were followed by warnings that the statements may no longer be accurate and would not be updated. The RCA Shareholders point to no precedent addressing facts like those present here.

While the RCA Shareholders' desire for updated information about AFIN's NAV is understandable, they had every right to walk away from the merger if they were not satisfied with outdated financial information. They had every right to decide not to go forward if they were not given current NAV numbers. The razor thin merger vote might reflect that sentiment from some of the shareholders. But given the Proxy's clear warnings, the RCA Shareholders cannot make a plausible claim that the Proxy statements regarding AFIN's NAV were materially false or misleading. For the foregoing reasons, accepting the allegations in the complaint as true and drawing all reasonable factual inferences in favor of the RCA Shareholders, the allegations concerning AFIN's NAV fail to state a plausible claim for relief.

B.

The RCA Shareholders also allege the Proxy failed to disclose material information about AFIN's sale of the Merrill Lynch properties. Specifically, they allege the capitalization rate for the transaction was 8.60%, almost two percentage points higher than AFIN's overall capitalization rate associated with its December 31, 2015 NAV. The RCA Shareholders claim the omission of the higher capitalization rate for the Merrill Lynch properties—which indicates a sale of those properties at a price that might lower AFIN's NAV from its December 31, 2015 value—made references in the Proxy to AFIN's December 31, 2015 NAV materially misleading.

Although carved out as a separate argument in their briefs, these allegations are essentially no different from the allegations about the NAV. The RCA Shareholders claim an event that occurred after the December 31, 2015, which had the effect of lowering AFIN's NAV, should have been disclosed. But that is exactly what the Proxy warned would not be done.

The same warnings described above apply to the alleged statements and omissions regarding the Merrill Lynch capitalization rate. *See* discussion *supra* Section III.A. Again, given those clear warnings, the RCA Shareholders cannot make a plausible claim that the alleged omissions regarding the Merrill Lynch capitalization rate made the Proxy materially false or misleading. For the foregoing reasons, accepting the allegations in the complaint as true and drawing all reasonable factual inferences in favor of the RCA Shareholders, the allegations concerning the Merrill Lynch capitalization rate fail to state a plausible claim for relief.

C.

The RCA Shareholders also allege that the Proxy's failure to disclose a loss resulting from SunTrust Bank's decision not to renew leases for forty-five branches was materially misleading. Specifically, they assert that the Proxy's discussion of AFIN's relationship with SunTrust Bank—which accounted for 17.8% of AFIN's rental income as of September 30, 2016—was materially misleading because it failed to disclose a $27.3 million loss with respect to forty-five of SunTrust's bank branches.

The decision to take the loss was not made until after the merger. The RCA Shareholders claim that even if the loss did not have to be disclosed in the Proxy because it was not finalized until after the merger, the conditions leading up to the loss were known and should have been disclosed in the Proxy.

To consider this claim, we turn again to the language of the Proxy. While the $27.3 million loss was not specified, the Proxy disclosed extensive information about the SunTrust properties. It disclosed the underlying properties leased to SunTrust and, for each property, it also disclosed the initial acquisition and improvement costs, the total capital costs, accumulated depreciation, annual rental income, encumbrances and lease expiration dates. The Proxy also disclosed that SunTrust had declared its intention to vacate when the lease expired for forty-five of its bank branch properties. In light of this information, which was disclosed, we find that the omission of the specific amount of the loss for the SunTrust properties and the conditions leading to it did not render the Proxy materially misleading.

Further, the warnings described above apply to these allegations as well. *See* discussion *supra* Section III.A. The loss at issue here is the type of event that the Proxy warned could happen after December 31, 2015. The Proxy made clear that, if such an event did happen, it would not be reflected in updated disclosures. Thus, given the Proxy's clear warnings that the information would not be included, the RCA Shareholders cannot now make a plausible claim that the alleged omissions made the Proxy materially false or misleading. For the foregoing reasons, accepting the allegations in the complaint as true and drawing all reasonable factual inferences in favor of the RCA Shareholders, the allegations concerning the SunTrust properties fail to state a plausible claim for relief.

D.

The RCA Shareholders also allege that AFIN's Standalone Projections rendered the Proxy materially misleading. The Proxy contained a two-page section referred to as Standalone Projections that included a chart projecting AFIN's future financial performance. The RCA Shareholders allege that the Standalone Projections were materially false or misleading because they omitted information that: (1) several of the areas of projected performance had declined in 2016 before the merger; (2) AFIN's rental income had grown only by 2% in 2016; and (3) AFIN's disappointing rental income growth resulted from the sale of the Merrill Lynch properties and the SunTrust Bank loss described above. Essentially, the RCA Shareholders argue that this negative financial information should have been disclosed and, because it was not, the RCA Shareholders were not given the full picture of AFIN's financial condition. Further, the RCA

16

Shareholders claim these omissions left the Proxy generally, and the Standalone Projections specifically, materially false or misleading.

The Standalone Projections, by their nature, related to events in the future. Projections of future performance are generally not actionable under the federal securities laws as long as they are not worded as guarantees. *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 290 (4th Cir. 1993). However, the Supreme Court has held that statements of opinion may be actionable if the statement omits material facts and if "those facts conflict with what a reasonable investor would take from the statement itself . . . ." *Omnicare*, 135 S. Ct. at 1329. Despite that holding, *Omnicare* cautions that "whether an omission makes an expression of opinion misleading always depends on context." *Id.* at 1330. An investor reads each statement "in light of all its surrounding text, including hedges, disclaimers, and apparently conflicting information." *Id.* "[A]n omission that renders misleading a statement of opinion when viewed in a vacuum may not do so once that statement is considered, as is appropriate, in a broader frame." *Id.* A reasonable investor is expected to understand a statement of opinion in its full context and there will only be liability for "the omission of material facts that cannot be squared with such a fair reading." *Id.*

Based on this authority, the allegations of the RCA Shareholders must be considered in the context of the warning language presented with the Standalone Projections. The Proxy contained nearly a page and a half of context including specific and tailored cautionary language regarding the estimates. First, it stated that "the AFIN Standalone Projections, is not being included in this joint proxy statement/prospectus to

17

influence your vote . . . ." J.A. 223. The Proxy explained that the Standalone Projections

were only disclosed because they had been made available to various professionals in the

merger negotiation process.

The Proxy then warned that including the projections did not indicate that AFIN,

their advisors or any other person ever considered "the AFIN Standalone Projections to

be material or to be necessarily predicative of actual future results and the AFIN

Standalone Projections should not be relied upon as such." *Id.* It also stated that "[t]here

can be no assurance that the AFIN Standalone Projections will be realized or that actual

results will not be significantly higher or lower than forecasted." *Id.*

And if there were still any question about the materiality of the projections, the

Proxy added that "although the AFIN Standalone Projections presented below is [sic]

presented with numerical specificity, these projections are not factual. The AFIN

Standalone Projections were based on numerous variables and assumptions that were

deemed to be reasonable as of the respective dates when the projections were finalized.

These assumptions are inherently uncertain . . . ." *Id.*

The Proxy went further to make clear that the Standalone Projections were subject

to change. The warnings language stated that the "AFIN Standalone Projections reflect

assumptions that are subject to change and do not reflect revised prospects for AFIN's

business, changes in general business or economic conditions or any other transaction or

event that has occurred or may occur . . . ." J.A. 223–224. Consistently, it added "AFIN

has not prepared revised standalone projections to take into account other variables that

have changed since the dates on which the AFIN Standalone Projections were finalized."

18

J.A. 224. It again warned that "[t]here can be no assurance that the AFIN Standalone Projections will be realized or that AFIN's future financial results will not materially vary from the AFIN Standalone Projections." *Id.*

The Proxy even advised that despite the possibility of change, the projections would not be updated. The Proxy emphasized that AFIN did "**not intend to update or otherwise revise the AFIN Standalone Projections to reflect circumstances existing after the date when made or to reflect the occurrence of future events, even in the event that any or all of the assumptions underlying such prospective financial information are no longer appropriate.**" *Id.* (emphasis in original).

Following the Supreme Court's guidance in *Omnicare*, the omissions alleged by the RCA Shareholders can quite easily be squared with the language of the Proxy's extensive and tailored warnings. In fact, those warnings addressed the very claims asserted by the RCA Shareholders. In light of the Proxy's clear warnings, the alleged improper omissions cannot plausibly be material.

Further, beyond the warning language, the Proxy contained information explaining AFIN's recent poor financial performance. The RCA Shareholders candidly explain that "[t]he gravamen of Plaintiffs' claim with respect to the Projections is that they misleadingly portrayed AFIN as a growing enterprise." Appellants' Reply Br. 7. But this statement and the allegations based on it are contradicted by the language in the Proxy. The Proxy did not portray AFIN as a financially "growing enterprise." In fact, it warned of the opposite.

The Proxy warned that "*AFIN has incurred operating losses and may not achieve profitability.*" J.A. 135. (emphasis in original). It then provided the specific reason for that warning explaining "[s]ince its inception in January 2013 through September 30, 2016, AFIN has incurred cumulative net losses . . . equal to $62.6 million. The extent of AFIN's future operating losses and the timing of the profitability are highly uncertain, and AFIN may never achieve or sustain profitability." *Id.*

It is difficult to imagine more clear warning language or language that would more squarely address the allegations that a proxy statement was materially false and misleading. Given the Proxy's clear warnings, the RCA Shareholders cannot make a plausible claim that the alleged omissions made the Proxy materially false or misleading. For the foregoing reasons, accepting the allegations in the complaint as true and drawing all reasonable factual inferences in favor of the RCA Shareholders, the allegations concerning the Standalone Projections fail to state a plausible claim for relief.[9]

IV.

The federal securities laws provide important protections against false and misleading statements and omissions. However, they do not provide guarantees of

---

[9] The RCA Shareholders also appeal the district court's ruling that they failed to state a plausible claim that RCA and AFIN violated Section 13(e) of the Securities Exchange Act of 1934, 15 U.S.C. § 78m(e), and its accompanying regulation, SEC Rule 13e-3, 17 C.F.R. § 240.13e-3. This appeal raises the question of whether there is an implied cause of action under Section 13(e). We need not address this issue in this case because, even if we were to imply a private cause of action, the RCA Shareholders' claim under this rule is duplicative of their Section 14(a) claim that we have already held to be insufficient. Thus, for the reasons stated above, the allegations concerning the Section 13(e) claim fail to state a plausible claim for relief.

financial success. Likewise, they do not render carefully tailored warnings meaningless. In the end, words matter, including words in proxy statements. When the words of a proxy statement, like the ones in this case, are not false or misleading and contain tailored and specific warnings about the very ommissions that are the subject of the allegations, those words render the claim for relief implausible. The words in the Proxy here do just that.

As the district court correctly concluded, the complaint fails to state claims for which relief can be granted. For all the foregoing reasons, the judgment of the district court is

*AFFIRMED.*

Case 1:17-cv-00132-CCB    Document 95    Filed 03/11/19    Page 24 of 26

FILED: March 11, 2019

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No.    18-1483,        Paradise Wire & Cable Defined v. Edward Weil, Jr.
                      1:17-cv-00132-CCB

_____

NOTICE OF JUDGMENT
_____

Judgment was entered on this date in accordance with Fed. R. App. P. 36. Please be
advised of the following time periods:

**PETITION FOR WRIT OF CERTIORARI:** To be timely, a petition for certiorari
must be filed in the United States Supreme Court within 90 days of this court's entry of
judgment. The time does not run from issuance of the mandate. If a petition for panel
or en banc rehearing is timely filed, the time runs from denial of that petition. Review
on writ of certiorari is not a matter of right, but of judicial discretion, and will be
granted only for compelling reasons. (www.supremecourt.gov)

**VOUCHERS FOR PAYMENT OF APPOINTED OR ASSIGNED COUNSEL:**
Vouchers must be submitted within 60 days of entry of judgment or denial of
rehearing, whichever is later. If counsel files a petition for certiorari, the 60-day period
runs from filing the certiorari petition. (Loc. R. 46(d)). If payment is being made from
CJA funds, counsel should submit the CJA 20 or CJA 30 Voucher through the CJA
eVoucher system. In cases not covered by the Criminal Justice Act, counsel should
submit the Assigned Counsel Voucher to the clerk's office for payment from the
Attorney Admission Fund. An Assigned Counsel Voucher will be sent to counsel
shortly after entry of judgment. Forms and instructions are also available on the court's
web site, www.ca4.uscourts.gov, or from the clerk's office.

**BILL OF COSTS:** A party to whom costs are allowable, who desires taxation of
costs, shall file a Bill of Costs within 14 calendar days of entry of judgment. (FRAP
39, Loc. R. 39(b)).

**PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC:** A petition for rehearing must be filed within 14 calendar days after entry of judgment, except that in civil cases in which the United States or its officer or agency is a party, the petition must be filed within 45 days after entry of judgment. A petition for rehearing en banc must be filed within the same time limits and in the same document as the petition for rehearing and must be clearly identified in the title. The only grounds for an extension of time to file a petition for rehearing are the death or serious illness of counsel or a family member (or of a party or family member in pro se cases) or an extraordinary circumstance wholly beyond the control of counsel or a party proceeding without counsel.

Each case number to which the petition applies must be listed on the petition and included in the docket entry to identify the cases to which the petition applies. A timely filed petition for rehearing or petition for rehearing en banc stays the mandate and tolls the running of time for filing a petition for writ of certiorari. In consolidated criminal appeals, the filing of a petition for rehearing does not stay the mandate as to co-defendants not joining in the petition for rehearing. In consolidated civil appeals arising from the same civil action, the court's mandate will issue at the same time in all appeals.

A petition for rehearing must contain an introduction stating that, in counsel's judgment, one or more of the following situations exist: (1) a material factual or legal matter was overlooked; (2) a change in the law occurred after submission of the case and was overlooked; (3) the opinion conflicts with a decision of the U.S. Supreme Court, this court, or another court of appeals, and the conflict was not addressed; or (4) the case involves one or more questions of exceptional importance. A petition for rehearing, with or without a petition for rehearing en banc, may not exceed 3900 words if prepared by computer and may not exceed 15 pages if handwritten or prepared on a typewriter. Copies are not required unless requested by the court. (FRAP 35 & 40, Loc. R. 40(c)).

**MANDATE**: In original proceedings before this court, there is no mandate. Unless the court shortens or extends the time, in all other cases, the mandate issues 7 days after the expiration of the time for filing a petition for rehearing. A timely petition for rehearing, petition for rehearing en banc, or motion to stay the mandate will stay issuance of the mandate. If the petition or motion is denied, the mandate will issue 7 days later. A motion to stay the mandate will ordinarily be denied, unless the motion presents a substantial question or otherwise sets forth good or probable cause for a stay. (FRAP 41, Loc. R. 41).

## U.S. COURT OF APPEAL FOR THE FOURTH CIRCUIT BILL OF COSTS FORM
(Civil Cases)

**Directions:** Under FRAP 39(a), the costs of appeal in a civil action are generally taxed against appellant if a judgment is affirmed or the appeal is dismissed. Costs are generally taxed against appellee if a judgment is reversed. If a judgment is affirmed in part, reversed in part, modified, or vacated, costs are taxed as the court orders. A party who wants costs taxed must, within 14 days after entry of judgment, file an itemized and verified bill of costs, as follows:
• Itemize any fee paid for docketing the appeal. The fee for docketing a case in the court of appeals is $500 (effective 12/1/2013). The $5 fee for filing a notice of appeal is recoverable as a cost in the district court.
• Itemize the costs (not to exceed $.15 per page) for copying the necessary number of formal briefs and appendices. (Effective 10/1/2015, the court requires 1 copy when filed; 3 more copies when tentatively calendared; 0 copies for service unless brief/appendix is sealed.). The court bases the cost award on the page count of the electronic brief/appendix. Costs for briefs filed under an informal briefing order are not recoverable.
• Cite the statutory authority for an award of costs if costs are sought for or against the United States. See 28 U.S.C. § 2412 (limiting costs to civil actions); 28 U.S.C. § 1915(f)(1) (prohibiting award of costs against the United States in cases proceeding without prepayment of fees).
Any objections to the bill of costs must be filed within 14 days of service of the bill of costs. Costs are paid directly to the prevailing party or counsel, not to the clerk's office.

Case Number & Caption: _____

Prevailing Party Requesting Taxation of Costs: _____

| Appellate Docketing Fee (prevailing appellants): | Amount Requested: _____ | | | | Amount Allowed: _____ | |
|---|---|---|---|---|---|---|
| Document | No. of Pages | | No. of Copies | | Page Cost (≤$.15) | Total Cost | |
| | Requested | Allowed (court use only) | Requested | Allowed (court use only) | | Requested | Allowed (court use only) |
| | | | | | | | |
| | | | | | | | |
| | | | | | | $0.00 | $0.00 |
| **TOTAL BILL OF COSTS:** | | | | | | | |

1. If copying was done commercially, I have attached itemized bills. If copying was done in-house, I certify that my standard billing amount is not less than $.15 per copy or, if less, I have reduced the amount charged to the lesser rate.
2. If costs are sought for or against the United States, I further certify that 28 U.S.C. § 2412 permits an award of costs.
3. I declare under penalty of perjury that these costs are true and correct and were necessarily incurred in this action.

Signature: _____     Date: _____

### Certificate of Service

I certify that on this date I served this document as follows:

Signature: _____     Date: _____